## Man O' War Racing Association, Inc., Appellant, v. State Horse Racing Commission.

434

Argued January 17, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Gordon W. Gerber,* with him *Raymond W. Midgett, Jr., John C. Newcomb, David J. Rachofsky, John T. Macartney,* and *Dechert, Price & Rhoads,* for Man O' War Racing Association, Inc., appellant.

*William F. Martson,* Assistant Attorney General, with him *Joseph P. Work,* Deputy Attorney General, and *William C. Sennett,* Attorney General, for State Horse Racing Commission and the Commissioners, appellees.

*Arlin M. Adams,* with him *Ralph S. Snyder, Bernard J. Smolens,* and *Schnader, Harrison, Segal & Lewis,* for Continental Thoroughbred Racing Association, appellee.

*Samuel E. Dennis,* with him *Richard R. Block,* and *Meltzer & Schiffrin,* for Eagle Downs Race Track, Inc., appellee.

*Gilbert Nurick,* with him *John J. Shumaker, David E. Lehman,* and *Shumaker, Williams & Placey,* and *McNees, Wallace & Nurick,* for Pennsylvania National Turf Club, Inc., appellee.

*Robert E. Woodside,* with him *Louis G. Feldmann,* and *Woodside & Woodside,* and *Feldmann & Ciotola,* for Shamrock Racing Association, Inc., appellee.

OPINION BY MR. JUSTICE ROBERTS, February 19, 1969:

The Pennsylvania Legislature enacted December 11, 1967, P. L. 707, a bill to authorize the conduct of thoroughbred horse racing with pari-mutuel wagering in the Commonwealth. In addition the legislation provided that an independent State Horse Racing Commission would be established and permitted to grant up to four licenses renewable annually for the conduct of horse race meetings for a maximum of 100 racing days each. Needless to say, the passage of the act provoked more than a little interest among various groups across the length and breadth of the Commonwealth; the Commission soon found itself in a position where it had to choose from among fifteen serious applicants.[1] It chose four, namely, The Continental Thoroughbred Racing Association, Inc., Eagle Downs Race Track, Inc., Pennsylvania National Turf Club, Inc. and the Shamrock Racing Association, Inc. It is these awards and the Commission's decision-making process which are raised as bases for Man O' War Racing Association's instant appeals; named as appellees are the four successful applicants, the Racing Commission and the individual members and chairman of the Commission, Member A. Marlyn Moyer, Member Thomas A. Livingston and Chairman Roy Wilkinson, Jr.

Before addressing ourselves to the issues raised by the appellant, since motions to quash have been filed in all of the appeals raising important questions about the relationship between decisions of administrative

---

[1] In addition to a $1,000 filing fee required of all applicants, each application required such detail about the proposed plant to be used and the possible management of the prospective licensee, that it is clear a substantial additional investment in both time and money was required before any of these corporations could begin to qualify as a responsible applicant.

agencies and review by our Court, we shall first pass on the merits of these motions. Basically the issues raised may be grouped into two categories—whether an appeal lies from the decision of the Racing Commission and whether the appellant has standing to challenge the decision even if an appeal lies.

## Appealability

The law in this Commonwealth is quite clear on the right to appeal from decisions of administrative bodies when the legislation does not explicitly provide for such a right. If an appeal is *prohibited* by an act, or the decision of an agency is described as final or conclusive, an appeal may be taken to the courts in the nature of narrow certiorari. In this type of appeal our inquiry is limited to questions of jurisdiction, the regularity of the proceedings, and constitutional issues. *Keystone Raceway Corp. v. State Harness Racing Commission*, 405 Pa. 1, 173 A. 2d 97 (1961); *Delaware County National Bank v. Campbell*, 378 Pa. 311, 106 A. 2d 416 (1954). On the other hand, if the legislation is *silent* as to the right of appeal or does not say that the decision of the administrative agency shall be nonappealable an appeal may be taken in the nature of broad certiorari. In these cases "the court may consider the record, including the testimony, to determine whether the findings are supported by competent evidence and to correct any conclusions of law erroneously made." *Delaware County National Bank v. Campbell*, 378 Pa. at 317-18, 106 A. 2d at 419; *Keystone Raceway Corp. v. State Harness Racing Commission*, 405 Pa. at 6, 173 A. 2d at 99; *Ritter Finance Co., Inc. v. Myers*, 401 Pa. 467, 165 A. 2d 246 (1960).

In the legislation before us, Act of December 11, 1967, P. L. 707, 15 P.S. §§2651-75, there is no provi-

sion for an appeal nor any section which would pro-
hibit an appeal after the granting of a license.[2] There-
fore, it follows that an appeal may be taken in the
nature of a broad certiorari. The next question is
whether this appeal will lie. The precondition to our
review by certiorari was only recently reiterated in the
*Keystone Raceway* case: "[F]or an appeal by certiorari
to lie the order or action of the agency, board or com-
mission *must be judicial in nature.*" (Emphasis sup-
plied.) 405 Pa. at 6, 173 A. 2d at 100; *Delaware Coun-
ty National Bank,* supra. However the cases have not
been either clear or consistent in their determination
of what factors should be considered in deciding wheth-
er an action is judicial. Compare *Delaware County
National Bank v. Campbell,* supra, with *Ritter Finance
Co. v. Myers,* supra. See *Newport Township School
District v. State Tax Equalization Board,* 366 Pa. 603,
609, 79 A. 2d 641, 644 (1951).

Without entering into a lengthy and perhaps fruit-
less discussion over this question, it seems safe to say
that regardless of which standard or standards are em-
ployed to determine whether an action or order is ju-
dicial, the grant by State Horse Racing Commission
clearly is. First, the decision making power of the

---

[2] The Racing Act provides in §20 that "If the State Horse Rac-
ing Commission shall *refuse* to grant a license applied for under
this act, or shall *revoke* or *suspend* such a license granted by it,
the applicant or licensee may demand . . . a hearing before the
commission . . . . Within thirty days after the conclusion of such
hearing, the commission shall make a final order in writing,
setting forth the reasons for the action taken by it . . . . The ac-
tion of the commission in refusing to grant a license or in revoking
or suspending a license shall be reviewable by the Court of Com-
mon Pleas of Dauphin County . . . ." (Emphasis supplied.) Since
the present appeal is from the *grant* of a license, this procedure
does not apply here. However, appellant has requested a hearing
under §20, which request presumably will be granted after the
completion of this appeal.

Commission and the manner in which it functions indicate judicial characteristics. Section 7 of the Horse Racing Act provides that "If, in the *judgment* of the State Horse Racing Commission, the public interest, convenience or necessity will be served thereby and a proper case for the issuance of such license is shown consistent with the purposes of this act and the best interests of racing generally, it may grant such a license . . . ." (Emphasis supplied.) Thus the Commission must judge the merits of each applicant in terms of complicated and multi-faceted statutory standards. This determination represents much more of an adjudicative process or judicial decision than that required in issuing, for example, occupational licenses, where the only determination is whether the applicant meets specific *minimum* standards. Further, the act itself contemplates that the Commission will be making determinations essentially judicial in character in light of the judgment which the Legislature committed to its Commission. In §20 of Act of December 11, 1967, P. L. 707, the Commission is instructed that "it shall have the power to administer oaths and examine witnesses, and may issue subpoenas to compel attendance of witnesses, and the production of all material and relevant reports, books, papers, documents, correspondence and other evidence," in conjunction with its hearing power.[3]

Second, the decisions made by the State Horse Racing Commission are so fraught with the public interest that an appeal must lie. See *Ritter Finance Co. v. Myers*, 401 Pa. at 475, 165 A. 2d at 250. Appellants correctly point to the magnitude of the tax revenues to be raised,[4] the enormous amounts of money which

---

[3] For the other pertinent provisions of §20, see note 2 supra.

[4] For example, Eagle Downs, Continental and Man O' War all estimated that in the first year's 100 day meeting, their tracks

will be wagered at Pennsylvania tracks, the importance of responsible supervision of legalized gambling and the importance of the proper introduction of thoroughbred racing as a sport in the Commonwealth, to demonstrate the public interest implications of a decision by the Commission. Appellees respond to this persuasive argument with the notion that "the prior illegality of the type of business at issue makes it obvious that there can be no strong public policy requiring appellate review." In our view this is simply a non sequitur; factors other than the prior legality of an enterprise must determine whether the public has an important stake in such an undertaking. In fact, it is just those activities which at one time were illegal and which have been made legal in order to add revenue to the public coffers which tend to be more infected with the public interest.

Third, and finally, some courts have considered whether the action "substantially affects property rights" to determine if the action is judicial. See, e.g., *Delaware County National Bank v. Campbell*, 378 Pa. at 321, 106 A. 2d at 421 (1954). To demonstrate that no such property rights are affected here appellees cite many cases which declare that liquor or horse racing licenses are privileges granted by the Legislature and thus do not represent property rights. See, e.g., *Tahiti Bar, Inc. Liquor License Case*, 395 Pa. 355, 150 A. 2d 112 (1959); *Fink v. Cole*, 1 N.Y. 2d 48, 133 N.E. 2d 691 (1956); *Rhode Island State Fair Assoc. v. Racing and Athletics Hearing Board*, 80 R.I. 486, 98 A.

---

would *each* handle $100,000,000 in wagering. Such an amount would represent revenue in the amount of $5,000,000 per 100 day meeting. But the potential revenue to the Commonwealth would not end there. In addition it would receive money from the tax of 50% on breakage, the 15% or 15¢ admission tax of §6, and the license fees and fines of §§11 and 12, respectively.

2d 821 (1953). In the technical sense this argument may be valid. One cannot have a property right in something which is being granted as a matter of legislative grace and one's current property rights are in no way affected by the grant of such a privilege to another.

However, to take such a narrow view of the licensing process herein involved not only yields an incongruous result, but also flies in the face of the test: does the decision "substantially affect property rights?" Indeed it must. That which is being granted is a very valuable privilege, even though it calls for a substantial investment. In addition, those who have sought a grant have expended large sums of money both for the application fee ($1,000) and in the preparation of the extensive application.[5] In a real sense the ultimate decision of the Commission in each instance involves large sums of money—both private investment and public revenues. It is our view that the determination of the Commission, involving as it does such great and important stakes, reinforces appellant's position that our Court can and should review the decision of the Commission.

## Standing

Appellees' next contention in their motions to quash is a challenge to the standing of the appellant to bring this suit assuming that our Court holds as it does that an appeal lies. The standard for testing whether a litigant has standing is agreed upon by both sides: "[The party] must have a direct interest in the subject-matter of the particular litigation, otherwise he can have no standing to appeal. And not only must the party desiring to appeal have a direct interest in the

---

[5] See note 1 supra.

particular question litigated, but his interest must be immediate and pecuniary, and not a remote consequence of the judgment. The interest must also be substantial." *Keystone Raceway Corp. v. State Harness Racing Commission,* 405 Pa. 1, 7-8, 173 A. 2d 97, 100 (1961).

We believe that *Keystone* clearly rules that the present appellant has standing. In that case, the appellant sought a review of the Harness Racing Commission's action after the Commission had only granted one of four authorized licenses. In holding that appellant had no standing, Mr. Chief Justice BELL (speaking for a four man majority) said "This is not the case of two or more persons (or corporations) applying for a license when only one license is available. Three licenses are still available for issuance by the Commission. Moreover, since the Philadelphia metropolitan area contains a very large percentage of the Commonwealth's population, it is not unlikely that the Commission would allocate another license to this area. . . . There is nothing in the record in this case which demonstrates or indicates that the grant of a license to Liberty Bell automatically excludes Keystone [the appellant] from consideration for a license." *Keystone Raceway Corp. v. State Harness Racing Commission,* supra at 10-11, 173 A. 2d at 102.

It is obvious that the fact situation in the instant case contains the missing elements which the majority in *Keystone* found so crucial. The present appeal is being prosecuted after *all* of the authorized licenses have been granted by the Horse Racing Commission. There is absolutely no chance that the Commission could grant a license to Man O' War this year under its present statutory mandate.[6] Therefore, it seems

---

[6] This, of course, would not be true if one or more of the applicants were unable to comply with the conditions established by

almost unnecessary to explain further what seems so apparent: In the current posture, appellant can easily demonstrate its direct, substantial, immediate and pecuniary interest in the matter in question. And as appellant so correctly argues: since the Attorney General represents the Commission, if an unsuccessful competing applicant is denied standing to appeal, *no one* ever will be able to challenge the Commission's grant of licenses.

Before leaving the issue of standing, we are confronted with special motions to quash filed by Shamrock Racing Association, Inc., the licensee-designate in Luzerne County and Pennsylvania National Turf Club, the licensee-designate in Dauphin County. Both argue that even if this Court should fail to grant the general motions to quash discussed above, we still should grant these special motions because appellant **does not have** standing to challenge the grant of their two licenses. Their reasoning for this proposition appears to be as follows: appellant did not apply for a license in either Luzerne or Dauphin County; neither Shamrock nor Pennsylvania Turf Club were interested in a license in the Philadelphia area; therefore Man O' War was not a competitor of either of these appellees and the litigation before this Court should be restricted to those who wish to conduct racing in the Philadelphia area. In addition, these two appellees rely on the language of the two-judge dissent in *Keystone Raceway*. In that opinion, the dissent would have granted standing to

the Commission at the time of the grants. For example, the grant to Continental included three conditions: "1. Construction of the racing facility as set forth in the application, subsequent data and public presentation in such a manner as to enable it to receive a tenant. 2. Written details of financing the aforesaid construction shall be forwarded to the Commission within thirty days thereof. 3. Approval of construction plans by this Commission, or its duly authorized representative, if required by this Commission."

appellant because "appellant seeks a license in the *same geographical area* in which this license has been granted." (Emphasis in original.) 405 Pa. at 11, 173 A. 2d at 102.

While these arguments seem appealing and persuasive at first reading, on reflection, we are satisfied that they are not sufficiently convincing to merit the granting of appellees' motions to quash. First, it is apparent that appellant is not only attacking the statute itself but also the manner in which the Commission proceeded under the statute in granting *all* the licenses. Second, appellant had an interest in the granting of each application since each grant presented appellant with that much less chance of receiving one for itself. It is not for this Court to speculate whether the Commission would have granted three, or even all four, licenses to the Philadelphia area. It is enough to establish appellant's standing that the Commission chose what it deemed to be the best four of fifteen submitted applications and appellant stands before us urging that *all* four represent abuses of discretion since it is better than *any* of the others. Finally, appellees' reliance on the reasoning of the dissent in *Keystone* is misplaced. There the Court was presented with a fact situation wherein three of the four authorized licenses had yet to be granted. Here, *all* the licenses have been awarded and thus reasoning from the *Keystone* case is inapposite. See p. 442, supra.

## Procedural Due Process

Appellant's first attack in this appeal centers on the fact that the Commission did not hold "formal" hearings before the grant of these four licenses. Specifically, appellant contends that without the right of cross-examination, it was unable to test the evidence

presented by each of the other applicants and demonstrate the invalidity of their presentations.[7]  To support the argument that such formal hearings were required, appellant points to §20 of the Racing Act, to the difficulty this Court would have in performing judicial review in the absence of such hearings and to the due process clauses of the Pennsylvania and Federal Constitutions.

Before reaching the merits of these claims, we must first consider appellees' argument that appellant cannot be heard for the first time to complain of the procedures employed by the Commission after sitting by silently when an opportunity was presented to object to the Commission's procedures at a much earlier stage of the proceedings.  In order to adequately discuss this contention a review of some Commission history is essential.  Each of those who had expressed any interest in applying for a track (including the attorney for Man O' War) received a letter dated June 27, 1968 over the signature of Roy Wilkinson, Jr., Chairman of the Commission.  It stated "The Commission will hold a meeting . . . on Wednesday, July 10th at 10: A.M. to afford those interested in applying an opportunity

---

[7] Although appellant makes additional arguments about the procedures employed, it seems only the lack of cross-examination merits consideration.  The other complaints could have been satisfied by appellant's availing itself of the right to file protests after each competing group's presentation.  Although such an opportunity was always available, appellant *never* filed a protest or opposition to any of the other applicants.  Nor can appellant claim that he did not receive notice of these other hearings; each applicant was required to advertise when its presentation would be made.  It is also quite obvious that the Commission would have given appellant this information if requested.  As to appellant's complaint that the witnesses were not sworn, the applications themselves were sworn to and that which was presented orally before the Commission was basically a clarification and emphasis of the important contents of the application.

to present to the Commission any suggestions they might have concerning the problem of selecting the areas in which licenses should be granted, criteria for granting licenses, *procedures,* etc. You may wish to present a written statement." (Emphasis supplied.)

In addition, a second letter was received by all prospective applicants (including Man O' War's attorney) dated July 2, 1968 and signed by William F. Martson, Counsel, State Horse Racing Commission. This letter read in pertinent part: "The State Horse Racing Commission has directed me to forward to you . . . the enclosed draft of an application for a license. . . . This draft is forwarded in order that you might examine same and be in a position to direct any questions or comments to the Commission, or its counsel, at the meeting [of July 10]. . . . A copy of the instruction sheet and a proposed Rule of the Commission is also enclosed."

The meeting called for July 10 was held as scheduled and a stenographic transcript was made of the events of the day; Man O' War was represented at the proceedings by one of its incorporators. At the outset of the meeting, the Chairman clearly indicated "Many of us, if not all of us have received a letter of invitation so that you know the meeting here today is essentially the same as the meetings I have described [with horsemen and New Jersey licensees], and that is an opportunity for the Commission to be told by you, the ones who are the principal users, of the way you think we ought to proceed to award these four licenses. . . ."

He then went on to describe with considerable particularity the procedures the Commission had tentatively adopted. "What we plan to do is on every application . . . to have a formal hearing presumably in a room not dissimilar to this . . . where the applicant is going to have an opportunity to present orally the

facts of his application as well as testimony in support of it. Now, like the Supreme Court we are going to be arbitrary and limit the amount of time; also like the Supreme Court we are going to limit the amount of material they can submit. This comes closer to the type of hearings before the Department of Banking. . . . You may prepare all your material in writing and then submit testimony that you consider key testimony.

"At the same time, there can be protests, and you can say [sic] quickly that there can be protestants from the area in which you are going to put the license. . . . We are going to allow other applicants who are contesting for the same license in any place in the state—they would not even have to be from the same geographical area—to come in and protest the granting of a license either by showing that the applicant is not qualified or by showing within the limits of time that the granting of the application here necessarily jeopardizes the granting of the application in the area where they want to apply, and that they are better qualified and they are going into a better area."[8]

At the end of this explanation the Chairman asked if there were any objections, suggestions or questions about the procedures as outlined. However, the transcript at this point notes "(No audible response.)" from the audience. Later, the Chairman again invited comment from the prospective applicants: "As Bill Martson has indicated, anybody who wishes to submit anything in writing afterwards may do so. This will be very helpful to us." Nor were these two opportunities for protest the only ones presented. At the end of the meeting, each applicant was granted a short period of time in which to make any remarks which the applicant thought might be relevant at the time.

_____
[8] Appellant never availed itself of this procedure.

The record seems quite clear to us. At every opportunity presented appellant to object to the procedures or suggest alternatives, not one mention was made by any representative of Man O' War that they considered the procedures inadequate, unfair or unsatisfactory. When the Chairman described the proposed procedures (in virtually the same terms as actually employed later), there was no protest. In response to his request for written comments after the meeting, appellant filed nothing. During the time allotted Man O' War at the end of the meeting on July 10, Mr. Raughlin, the President of Riddle Memorial Hospital, used the time to briefly describe the proposed nonprofit irrevocable charitable trust plan under which Man O' War planned to operate. Further, it is abundantly apparent from the call for the meeting, that this was the time, place and opportunity when appellant should have presented comments, suggestions or objections on Commission procedures. Since our careful and tedious examination of the record indicates that appellant failed to raise these objections at any time below, it is our view that Man O' War cannot be heard to complain at this late stage of the proceedings. Therefore, we conclude, without deciding the merits of any of appellant's due process contentions, that appellant has waived its right to raise these objections at this time. To do otherwise would break precedent with all our numerous holdings which enunciate that we will not consider on appeal issues not raised below and that such unraised issues may not be the basis of reversal here.[9] See *Brenner v. Sukenik*, 410 Pa. 324,

---

[9] It is our view that this disposition of appellant's procedural due process claim also settles its claim that the Racing Act is unconstitutional.

Rule 8, Pa. R. C. P. does not bar this Court from finding a waiver by appellant for failure to raise these issues below. The

189 A. 2d 246 (1963) ; *Bechler v. Oliva,* 400 Pa. 299, 161 A. 2d 156 (1960).

## Abuse of Discretion

The Commission was authorized to grant licenses to corporations if "the public interest, convenience or necessity will be served thereby and a proper case for the issuance of such a license is shown consistent with the purposes of this Act, and the best interests of racing generally." It is appellant's contention that the Commission, though given broad discretion to choose among the various applicants, abused this discretion in failing to award a license to applicant Man O' War. However, after a careful review of the entire record, it seems clear that all of the applicants which the Commission selected had excellent qualifications and complied with the objectives of the act, and that there is no evidence of an abuse of discretion on the part of the Commission.

It must be remembered that the Legislature delegated to the Commission an important and sensitive task of picking four applicants from a group of many more qualified corporations. In performing this arduous and responsible task, the Commission was charged with balancing many competing interests. First, there was the goal of raising revenues for the

---

rule in relevant part reads: "No question shall be heard or considered by the court which was not raised at the hearing before the agency except (a) questions involving the validity of a statute or the procedure before the agency . . . ." However, Rule 3 emphasizes that these "Rules of Civil Procedure Governing Appeals from Certain Administrative Agencies" *only* apply to appeals filed in the Court of Common Pleas of Dauphin County, and therefore are not applicable when this Court exercises its power to review in the nature of broad certiorari the proceedings before an administrative agency.

state. Second, there was the importance of attracting first-rate thoroughbred competition into the Commonwealth tracks, and promoting horse racing as a sport. Subsumed in these areas were important considerations involving potential management, track facilities, racing dates, night or day time racing, conversion of harness racing tracks or building new facilities, location and surrounding population, road networks and parking facilities, stables and employee accommodations and many other factors which need not be listed here.

The importance of appreciating the number of technical and precise factors with which the Commission had to contend is only to emphasize what must be obvious. The Legislature vested this authority in the Commission because of the expertise and judgment required in making the important decision which corporations were to be granted licenses. Thus the Commission was required to exercise an administrative discretion which under the circumstances was exclusively committed to it under the statutory mandate of the Legislature. In our role as a reviewing court, we must enter upon the performance of our judicial function ever mindful of the deference we should show to the Commission's determinations. It is possible that if this Court had been called upon to carry out this important task, we might have chosen different applicants, perhaps because we might have placed more emphasis on certain factors which the Commission did not consider especially important. *But even* if we would have chosen different applicants, this does not in any way cast doubt upon the determination made by the Commission. Because it was not this Court, but the Commission which has been charged with this responsibility. *Our* scope of review is severely limited; what we must find in order to overturn the grants is

a clear abuse of discretion. See *Zeltner Liquor License Case*, 174 Pa. Superior Ct. 98, 100 A. 2d 132 (1953); *Zermani Liquor License Case*, 173 Pa. Superior Ct. 428, 98 A. 2d 645 (1953).[10] But there is none present here.

We need not review all of the qualifications of each successful applicant and compare them with the qualifications of Man O' War to demonstrate this point. The record is replete with clear indications that all four successful applicants were highly qualified (as was appellant). Our review of the transcripts of each of the presentations and a careful study of each application indicates that the Commission was in the fortunate albeit difficult position of choosing from among fifteen applicants, all of whom seemed financially responsible, familiar with horse racing, imbued with sufficient enthusiasm, ready to build or rent an appropriate facility, composed of civic leaders and prepared to promote thoroughbred horse racing throughout the Commonwealth. Thus appellant's argument that review of the qualifications of all the applicants would reveal "the overwhelming superiority of Man O' War" must be rejected as mere hyperbole. Nor do we find in the record before us any indication that appellee Eagle Downs failed to make out a "proper case."

Appellant also argues that the inclusion of §17 in the Horse Racing Act indicates a legislative intent that a track be placed in Philadelphia County. The pertinent section provides ". . . as to thoroughbred horse race meetings held within school districts of

---

[10] "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Mielcuszny v. Rosol*, 317 Pa. 91, 93-4, 176 A. 236, 237 (1934).

the first class the permit holder shall pay the school district in which the thoroughbred horse race meeting is held a tax of two per cent of the amount wagered each day, which tax is hereby imposed for general school purposes." However, it seems obvious to us that this was only one of many factors which the Commission was charged with considering during its deliberations. If the Legislature wanted to require a track to be placed in a first class school district it would have said so explicitly. This it did not do. Further the Commission did take the provision for this tax into serious consideration, but the minutes of the Commission clearly indicate why they chose not to grant a license to Philadelphia. "The Commission noted that no application had been filed with it for construction of a new track within the limits of Philadelphia. . . . The Commission determined that in the best interests of producing revenue for the Commonwealth, and in serving the public interest, convenience and necessity, and in the best interests of racing generally, the Commonwealth should have a new and modern, independent track occupied by two licensees. . . ." The decision that a new track in the Philadelphia area was more important *to thoroughbred racing* than the tax for school districts of the first class was clearly within the discretion of the Commission and hardly justifies a reversal of their grants.

Appellant points to several additional factors which it contends represent abuses of discretion by the Commission. These include: (1) the ability of Man O' War to start racing earlier than any of the other applicants; (2) the discrepancy between the patron capacity and the parking capacity at the proposed Neshaminy Park (where Continental and Eagle Downs plan to race); (3) the need to build a road network around Neshaminy Park whereas one is already in place around

Liberty Bell Park (where Man O' War intended to race); (4) of the amount of "handle" (the amount wagered), Man O' War was willing to contribute a greater percentage for purses and stakes than the other applicants; (5) Eagle Downs applied to be a joint owner of Neshaminy Park with Continental, but the Commission's grant was for Eagle Downs to be a tenant of Continental; (6) doubt that if only $25,000,000 were spent on a new facility (Neshaminy Park) that it could compare in quality with a $20,000,000 plant built five years ago (Liberty Bell); (7) the Commission granted Shamrock the right to race at a converted harness racing track, while denying Man O' War the same right; (8) if the Commission wanted a new track in the Philadelphia area, they should have awarded a license to Continental *and also* awarded a license to Man O' War to race at Liberty Bell Park. We need not discuss each of these claims individually. Merely a cursory examination of all of them, indicates that neither any one nor all taken together point to an abuse of discretion. All these factors are present because the Commission, in its own area of expertise, judged that whatever disadvantages would result from making the grants as they did, were outweighed by numerous other factors which it also had to consider. Certainly none of these complaints would justify disturbing the overall administrative judgment of the Commission.

Finally, appellant argues that the Commission was without authority to grant temporary licenses to Continental, Eagle Downs and Pennsylvania National Turf to operate at existing harness racing tracks until their proposed new facilities are completed. It claims that such a license violates §4 of the Racing Act which requires a licensee to race at the location designated in its certificate of incorporation. Needless to say, the

454

certificates of incorporation in these cases all set out the site of their *planned* facilities. However, it seems to us that this is merely a technical requirement and that an amendment of the several articles of incorporation would be a more appropriate remedy than overturning the grants already made. We believe that it was entirely within the power of the Commission and consistent with the Act's purpose (both prompt initiating of the program and raising revenue for the Commonwealth) for the Commission to authorize temporary licenses until such time as the new tracks are completed.

## Conclusion

We have reviewed all of the contentions on both sides extremely carefully. Review of the Commission's determination has required extensive examination of the minutes of the Commission, the applications, the transcripts of proceedings before the Commission, and the correspondence between all concerned. It is our conclusions that (1) appellant has standing to bring this appeal; (2) under these circumstances an appeal will lie from a grant of a license by the Commission; (3) appellant waived its right to raise its procedural due process claims before our tribunal by remaining silent below; (4) the grants made by the Commission do not represent any abuse of discretion nor error of law on its part.

Motions to quash denied. The grants of licenses are affirmed.

Mr. Justice EAGEN concurs in the result.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE POMEROY:

I respectfully disagree with the opinion of the majority on the preliminary issue of whether an appeal

properly lies in this case; specifically, the conclusion that the action of the State Horse Racing Commission in granting licenses is clearly judicial.

Admittedly the determination of whether a particular action of an administrative agency is "legislative" or "administrative" on the one hand or "judicial" on the other is a difficult one, and the proper tests for differentiating these types of activities by governmental bodies remain to a large extent undefined.[1] I am, however, unable to accept the courts' criteria that lead it to say that the Horse Racing Commission's grants in this case were "judicial". Hence I would grant the motions to quash the appeal.

The language of the Act, insofar as the grant of licenses, as distinguished from refusal or revocation, is concerned, is not descriptive of a judicial process. The word "judgment" as used in §7(a) is meant in its common usage, not as a word of art. Determination of "the public interest" and "the best interests of racing generally" are the main considerations of the Commission in its grant of licenses under §7(a). The action of the Commission is the bestowing of a privilege by the Commonwealth based on its investigation and its "judgment" relative to the public interest, and consonant with what it considers the best interests of racing. This function, and the process prescribed for exercising it, seems administrative rather than judicial in nature.

Section 20, to be sure, does speak in terms of what is probably a quasi-judicial proceeding before the Commission, but this has to do with refusal or revocation, not the grant, of licenses.[2] This section, incidentally,

---

[1] See p. 438 of the majority opinion.

[2] The nature and scope of such hearing before the Commission, and the effect of a holding by the Commission in favor of an aggrieved applicant or licensee, as the case may be, are not spelled

provides for appeal, but to the Dauphin County Court of Common Pleas pursuant to the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, 71 P.S. §1710.41 et seq. As the majority opinion indicates, a §20 hearing has been requested but not yet held.

Further, the fact that Commission decisions are "fraught with a public interest" does not compel the right to appeal.[3] It is clear that there are many non-judicial actions by governmental bodies that involve large public interests, but which are not *ipso facto* then appealable. Witness, for example, the promulgation of rules and regulations of boards or agencies, the hearings and findings of legislative and executive committees or commissions, and the determinations of individual officials in important governmental positions.

Finally, the fact that horse racing licenses are valuable privileges and that the decision to grant a license therefore carries with it a large monetary impact, does not seem to me to fit the criterion of "substantially affecting property rights". Just as the public interest may be affected by nonjudicial actions, so may substantial property rights. But in the posture of this case, the appellant is seeking, and has not yet obtained, the property right involved. The filing fee, while substantial, and the legal and other expenses involved in prosecuting an application, are not in themselves property rights within the meaning of the appealability test.[4]

---

out in the Act establishing the State Horse Racing Commission, and are not before the Court in this case.

[3] Neither the appellant's brief nor the majority opinion cite any direct authority for the proposition that the presence of the "public interest" indicates the judicial nature of an agency's action. But see *Ritter Finance Co. v. Myers*, 401 Pa. 467, 165 A. 2d 246 (1960).

[4] See cases cited on pp. 437-38 of the majority opinion.

Since the majority has allowed the appeal to stand and has decided on the merits, I record herewith my concurrence with those portions of the opinion which conclude that appellant has a sufficiently direct interest to give it standing to appeal; that appellant has waived its right to raise procedural due process claims by not making timely objection before the Commission; and that no abuse of discretion or error of law appears from the grants of licenses made by the Commission.

DISSENTING OPINION BY MR. JUSTICE COHEN:

Pennsylvania has long enjoyed horse racing, both standardbred and thoroughbred. One need only be a visitor at a county fair to recognize that horse racing in one form or another is a tradition in Pennsylvania. What the legislature accomplished by Act of December 11, 1967, P. L. 707, was to authorize the setting up of gambling facilities at horse races contrary to existing law. In effect, the legislature has granted immunity from the impact of the Act of June 24, 1939, P. L. 872, §605, 18 P.S. §4605 (setting up or establishing gambling places), §603, 18 P.S. §4603 (maintaining gambling devices or apparatus), §606, 18 P.S. §4606 (enticing persons to visit places used for gambling), §699.5, 18 P.S. §4699.5 (running horses for money), to those licensed to conduct pari-mutuel betting at horse races.

The grant of permission to establish gambling places in the Commonwealth should not be bestowed without the most stringent safeguards on the exercise of the grant by the sovereign. Both this act and the act that permits harness racing are deficient in this respect. Neither act required hearings to establish the factual basis necessary to evaluate the proper action and hence are void for vagueness.

458

In *Ashbacker Radio Corp. v. Federal Communications Commission*, 326 U.S. 327, 90 L. ed. 108 (1945), the United States Supreme Court held that where there are multiple applications for one vacancy, the Commission can decide which application should be granted only after a public hearing on all of them. This same procedure has been adopted and followed by the Pennsylvania Liquor Control Board. In the event there is more than one applicant for a vacancy, a grant is made by the Board only after an open hearing on each application.

The Commission recognized this deficiency in the act when it established "ad hoc hearings" upon its own initiative. But the procedure which they established does not in my opinion qualify as a hearing, nor does it afford an applicant procedural due process. Unsworn testimony was accepted, cross-examination was not permitted, and there was no requirement that all information be presented publicly. This restrictive procedure was a "hearing" in name only and served as a screen behind which the Commissioners could bestow the licenses in whatever manner they desired.

I dissent.