**BEDFORD DOWNS MANAGEMENT CORPORATION, Petitioner**

v.

**STATE HARNESS RACING COMMISSION, Respondent**

**Valley View Downs, LP, Petitioner**

v.

**State Harness Racing Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 5, 2006.

Decided June 19, 2006.

---

Victor P. Stabile, Harrisburg, for petitioner, Bedford Downs Management Corporation.

Michael A. Finio, Harrisburg, for petitioner, Valley View Downs, LP.

Jorge M. Augusto, Asst. Counsel, Harrisburg, for respondent, State Harness Racing Commission.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge FRIEDMAN.

Bedford Downs Management Corporation (Bedford) and Valley View Downs, LP, (Valley View) petition for review of the November 3, 2005, order of the State Harness Racing Commission (Commission), which denied both of their applications for the sole remaining license to conduct harness horse race meetings at which parimutuel wagering is permitted. With respect to the denial of Bedford's application, we vacate and remand. We affirm the denial of Valley View's application.

Section 205(b) of the Race Horse Industry Reform Act (Reform Act), Act of De-cember 17, 1981, P.L. 435, *as amended,* 4 P.S. § 325.205(b), states that no more than five corporations shall be licensed by the Commission to conduct harness horse race meetings with pari-mutuel wagering. For many years, two licenses were available for issuance, but there was no interest in them. (Adjud. at 60.) However, the prospect of a law permitting slot machine gaming at racetracks stirred interest in the licenses. (Adjud. at 62.) In 2003, the Commission issued a license to Chester Downs, which left one more license that the Commission could issue under the Reform Act. (Adjud. at 60.)

On December 27, 2002, Valley View filed with the Commission an "Application for a License to Conduct a Harness Horse Race Meeting with Pari–Mutuel Wagering." (Findings of Fact, No. 1.) On April 3, 2003, the Commission announced a new Statement of Policy, effective May 3, 2003, which applied to pending and new license applications. (Findings of Fact, No. 2.) The Statement of Policy declared that the Commission would treat applicants for the remaining license as a comparative group; however, the Commission would not be obligated to issue any license despite the fact that a license was available. (Adjud. at 49.)

In May 2003, the Commission published notice in the Pennsylvania Bulletin establishing a sixty-day license application period from May 24, 2003, to July 22, 2003. (Findings of Fact, No. 4.) On June 9, 2003, Bedford filed an "Application for a License to Conduct a Harness Horse Race Meeting with Pari–Mutuel Wagering." (Findings of Fact, No. 5.)

On July 5, 2004, the Governor of Pennsylvania signed into law the Pennsylvania Race Horse Development and Gaming Act (Act 71), 4 Pa. C.S. §§ 1101–1904. Under Act 71, a person who has been approved

by the Commission to conduct harness horse race meetings with pari-mutuel wagering may apply to the Pennsylvania Gaming Control Board (Gaming Control Board) for a license to operate slot machines at a licensed racetrack facility. 4 Pa.C.S. § 1302(a)(3); (Adjud. at 51).

Hearings were held on the applications, and, on November 3, 2005, after considering the evidence, the Commission denied the applications of both Valley View and Bedford. In doing so, the Commission considered the integrity and suitability criteria in Act 71 in addition to the criteria set forth in the Reform Act.[1] The Commission explained that, obviously, slot machine gaming was the driving force for the interest in the last available license, and, although the Commission is not empowered to issue a gaming license under Act 71, the successful applicant would have to meet the requirements of Act 71 in order to operate slot machines at racetracks. (Adjud. at 62.)

The Commission denied Valley View's application as not consistent with the best interests of racing because: (1) its plan to have patrons and horsemen share one main entrance would not be safe, (Adjud. at 64, 66); (2) its tight track radius and increased banking would not be safe for horses, (Adjud. at 65–66); (3) its plan for a paddock on the backside of the track would be inconvenient for owners and would prevent the public from being able to see and have access to the horses, (Adjud. at 67); and (4) the topography of the land would prevent having a separate gate or entrance on the backside of the track, (Adjud. at 66). (Conclusions of Law, No. 14.)

The Commission denied Bedford's application because: (1) the deceased grandfather of Bedford's principal owners had conducted business with reputed organized crime figures through companies that he owned, (Adjud. at 77); (2) the deceased grandfather acquired most of the land upon which Bedford plans to build its facility while his companies were attempting to earn money by dealing with reputed organized crime figures, (Adjud. at 81); and (3) although Bedford presented a "highly confident" letter[2] issued by Merrill Lynch, which appeared to establish adequate financing for the project, the letter did not identify the borrower; the letter required more conditions than Valley View's "highly confident" letter; and the letter was issued, in substantial part, based on the original involvement of Isle of Capri Casinos, Inc. (Isle of Capri) and CIBC World Markets (CIBC),[3] rather than Merrill Lynch's own extensive review of the Bedford project or of the individuals involved in the Bedford project, (Adjud. at 71–72).

---

1. Section 1310(a) of Act 71 provides, in pertinent part, as follows:

 Every application for a slot machine license shall include such information, documentation and assurances as may be required to establish by clear and convincing evidence the applicant's good character, honesty and integrity. Information shall include, without limitation, information pertaining to family, habits, character, reputation, criminal history background, business activities, financial affairs and business, professional and personal associates, covering at least the ten-year period immediately preceding the filing date of the application.

4 Pa.C.S. § 1310(a).

2. A "highly confident" letter is a letter provided by a financial institution exhibiting its confidence in the ability to raise financing for a specific project. (R.R. II at 1564a.)

3. CIBC, the United States Securities arm of Canadian Imperial Bank of Commerce, has been an active financier to the gaming industry for nearly twenty years and has worked with Isle of Capri in the past. (R.R. II at 1561a.)

(Conclusions of Law, Nos. 16, 18–19; R.R. II at 1561a, 1594a.)

On December 1, 2005, Bedford filed a petition for reconsideration with the Commission. (R.R. I at 114a–64a.) On December 8, 2005, Valley View filed an incomplete copy of a petition for a hearing and reconsideration. (R.R. III at 2407a–66a.) On December 9, 2005, Valley View filed exhibits in support of its petition. (R.R. III at 2467a.) In its petition for reconsideration, Valley View alleged, *inter alia,* that it was denied due process before an impartial tribunal, asserting for the first time that two Bedford witnesses were "business associates" of a member of the Commission. (R.R. III at 2419a–20a.)

On December 9, 2005, Bedford and Valley View filed petitions for review with this court. (R.R. I at 265a; R.R. III at 2467a.) In separate letters, each dated December 12, 2005, the Commission informed Bedford and Valley View that, because each had filed a petition for review with this court, the Commission no longer had jurisdiction over the petitions for reconsideration. (R.R. I at 265a; R.R. III at 2467a.)

 On February 17, 2006, Valley View filed an application for special relief with this court, seeking an order remanding the case to the Commission for reconsideration, specifically with regard to Valley View's allegation that one of the members of the Commission was biased against Valley View. In response, Bedford argued that a remand on this issue was not necessary because: (1) the Commission's vote denying Valley View's license application was unanimous; (2) thus, the vote of the allegedly biased member did not determine the result; and (3) the allegedly biased member also voted to deny Bedford's license application. (Bedford's response, ¶¶ 9, 12(b), (d).) On March 3, 2006, this court issued an order denying Valley View's application. We now address the merits of the petitions for review.[4]

## I. Legal Framework

The Commission's Statement of Policy states that the Commission will consider applications "comparatively as part of a consideration group," and "after consideration and comparison of all ... applications, [the Commission] may issue available licenses ... to those applicants who, in the sole judgment of the ... [Commission], will best serve the public interest, convenience and necessity." 7 Pa.Code § 133.4(A) & (G).

The Reform Act authorizes the Commission to issue a license if, in its judgment, "the public interest, convenience or necessity will be served and a proper case for the issuance of the license is shown...." Section 209(a) of the Reform Act, 4 P.S. § 325.209(a). The Commission "may refuse to grant" a license if it determines that:

> (1) Any officer, director, member or stockholder of the corporation applying

4. Our scope of review of an agency's adjudication is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law and whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704. An agency's adjudication is not in accordance with the law if it represents a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. *Slawek v. State Board of Medical Education and Licensure,* 526 Pa. 316, 586 A.2d 362 (1991). An agency abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or exercises judgment that is manifestly unreasonable, or is the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record. *Man O'War Racing Association v. State Horse Racing Commission,* 433 Pa. 432, 250 A.2d 172 (1969).

for a license or of any corporation which owns stock in or shares in the profits, or participates in the management of the affairs of the applicant, or which leases to the applicant the track where it shall operate:

(i) has been convicted of a crime involving moral turpitude;

(ii) has engaged in bookmaking or other forms of illegal gambling;

(iii) has been found guilty of any fraud or misrepresentation in connection with racing or breeding;

(iv) has been guilty of any violation or attempt to violate any law, rule or regulation of any racing jurisdiction, for which suspension from racing might be imposed in such jurisdiction; or

(v) has violated any rule, regulation or order of the [Commission].

(2) The experience, character or fitness of any officer, director or stockholder of any of the corporations is such that the participation of the person in horse racing or related activities would be inconsistent with the public interest, convenience or necessity or with the best interests of racing. If the [C]ommission determines that the interest of any stockholder referred to in this paragraph or in paragraph (1) is insufficient to affect adversely the conduct of pari-mutuel horse racing by the corporation in accordance with the provisions of this act, the [Commission] may disregard the interest in determining whether or not to grant a license to the corporation....

Section 209(e) of the Reform Act, 4 P.S. § 325.209(e). In addition, the Commission may not issue a license until it has approved "the location of [the] proposed grounds and race track, together with a plan of the track and plans of all buildings, seating stands and other structures...." Section 227 of the Reform Act, 4 P.S. § 325.227. Finally, in considering an application, the Commission shall consider "the best interests of racing generally." 58 Pa. Code § 185.16.

## II. Valley View—No. 2447 C.D. 2005

### A. Commission's Issues

Before addressing the issues raised by Valley View in its brief, we shall address the Commission's contention that Valley View did not preserve all of those issues.

### 1. Failure to Set Forth Objections

■ The Commission first argues that this court should quash Valley View's petition for review for failure to preserve *any* issues for appellate review. The Commission contends that: (1) Valley View failed to set forth in its petition for review a general statement of objections to the Commission's November 3, 2005, order; (2) Valley View merely attached a copy of its sixty-page petition for reconsideration to the petition for review and alleged that the Commission erred "as more fully set forth in Exhibit B,"[5] (Valley View's petition for review, ¶¶ 6–7); and (3) this practice violates Pa. R.A.P. 1513(d). We are not persuaded.

Although it might be preferable for a petitioner to set forth a general statement of objections within the petition for review itself, the rules of appellate procedure are to be liberally construed to secure a just determination of every matter to which they apply. Pa. R.A.P. 105(a). Thus, we will not quash Valley View's petition for review simply because Valley View set forth its objections in an attachment.

---

**5.** We note that Valley View incorrectly identified its petition for review as Exhibit B when, in fact, it is Exhibit A.

## 2. Denial of Reconsideration

■ Valley View asserts in its brief that the Commission erred in denying reconsideration for lack of jurisdiction. However, the Commission points out that Valley View has not filed a petition for review of the December 12, 2005, denial of reconsideration under Pa. R.A.P. 1512(a)(1).[6] Thus, the denial of reconsideration is not properly before this court. We agree.

This court has held that a party may appeal from an administrative agency order denying reconsideration of a decision of that agency. *Muehleisen v. State Civil Service Commission,* 66 Pa.Cmwlth. 95, 443 A.2d 867 (1982), *aff'd,* 501 Pa. 335, 461 A.2d 615 (1983). With respect to the Commission, the regulation at 58 Pa.Code § 185.85(a) gives any party the right to appeal from a Commission order denying reconsideration. Here, because Valley View did not file an appeal from the Commission's December 12, 2005, denial of reconsideration, Valley View may not challenge the denial of reconsideration.

## 3. Biased Commissioner

Valley View asserts in its brief that it was denied due process before an impartial tribunal because one of the members of the Commission was biased against Valley View. However, the Commission contends that this is the very issue addressed by this court in its March 3, 2006, order denying Valley View's application for special relief and that the matter should not be considered further. We agree.

After Valley View argues in its brief that it was denied a hearing before an impartial tribunal, Valley View states, "This is the issue raised in Valley View's . . . Application of February 17, 2006, which was denied by Order of March 3, 2006." (Valley View's brief at 11.) Inasmuch as this court denied Valley View's request for a remand to create a record regarding its allegation of bias, there is no record for this court to review with respect to the issue. Thus, we shall not consider the matter further.

## 4. Chester Downs

■ Valley View asserts in its brief that it was denied due process when the Commission did not utilize the same procedures in considering the applications of Valley View and Chester Downs. However, the Commission contends that the record lacks any evidence pertaining to the Chester Downs proceedings; thus, it is not possible for this court to review the matter. We agree. This court is required to review the Commission's quasi-judicial order based on the record made before the Commission. *See* Pa. R.A.P. 1551(a). Absent a record pertaining to the Chester Downs proceedings, it is not possible for this court to conduct appellate review of the Chester Downs due process issue.[7]

## 5. Notice

■ Valley View asserts in its brief that it was denied due process when the Commission awarded no license without giving notice that the Commission would interpret literally that portion of the Statement of Policy indicating that the Commission

---

6. Pa. R.A.P. 1512(a)(1) states that a petition for review of a quasi-judicial order shall be filed *within thirty days after entry of the order.*

7. We note, however, that, in *Pittsburgh Palisades Park, LLC v. Pennsylvania State Horse Racing Commission,* 844 A.2d 62 (Pa.

Cmwlth.), *appeal denied,* 581 Pa. 702, 864 A.2d 1206 (2004), this court stated that it was not error for the State Horse Racing Commission to apply its new comparative group review policy to licenses that were not granted at the time the commission published the policy.

had no obligation to issue a license. (Valley View's brief at 18.) However, the Commission contends that Valley View did not raise this issue before the Commission, and, thus, under Pa. R.A.P. 1551, it is waived. We do not agree.

Pa. R.A.P. 1551(a)(3) states that no question shall be considered by an appellate court which was not raised before the government unit, *except* questions which the court is satisfied could not by the exercise of due diligence have been raised before the government unit. Until the Commission issued its order denying both applications, Valley View could not have known that the Commission would not award a license to anyone. Because Valley View could not have raised notice as an issue until the result was determined, the matter is not waived.

■ Nevertheless, the Commission's Statement of Policy requires that the "Application Notice" indicate that the Commission is "not obligated to issue any license despite the availability of a license." 7 Pa. Code § 133.4(4). In addition, the notice must indicate that the Commission, after considering and comparing all applications in a consideration group, "may issue" an available license. 7 Pa.Code § 133.4(G). Therefore, the Commission's Statement of Policy gave clear notice to Valley View that the Commission might not issue any license.

#### 6. Statement of Policy

■ Valley View asserts in its brief that the comparative process set forth in the Statement of Policy denied Valley View due process because the decision to grant or deny a license was based on unknown standards. The Commission contends in its brief that Valley View failed to challenge the comparative process; thus, the issue is waived. We agree.

Except in situations that do not apply here, an appellate court will not consider a question that was not raised before the government unit. Pa. R.A.P. 1551(a). Valley View asserts in its brief that it raised the unknown standards issue in its petition for reconsideration. (Valley View's brief at 17 n. 20.) However, this court has stated that when issues are raised for the first time in a reconsideration request, after the agency has issued its adjudication, it cannot be regarded as raising the issues while the matter was before the agency. *Frankford Hospital v. Department of Public Welfare,* 77 Pa. Cmwlth. 448, 466 A.2d 260 (1983). Thus, the issue is waived.[8]

### B. Valley View's Remaining Issues

#### 1. Suitability of Parent Corporation

Valley View argues that the record lacks substantial evidence to support the Commission's *implicit* finding that, because the Indiana Racing Commission had disciplined Valley View's parent corporation, the corporation is not suitable to hold a license. However, the Commission did not reject Valley View's application for that reason. The Commission stated that "this issue would have been a significant stumbling block, *if the Commission had not rejected Valley View on other grounds.*" (Adjud. at 70) (emphasis added). Thus, we shall not discuss the matter further.

#### 2. One Main Entrance

■ Valley View next argues that the record lacks substantial evidence to sup-

---

8. Even if Valley View had not waived the issue, we note that the standard applied by the Commission in this case was not unknown. The Commission applied the stan-

dards set forth in the law, particularly whether the issuance of a license would be in the best interests of racing.

port the Commission's conclusion that one main entrance for patrons and horsemen is not in the best interests of racing. Valley View contends that it presented evidence to show that, if the Commission is concerned about horsemen sharing a main entrance with patrons, Valley View could build a separate entrance for horsemen adjacent to the main entrance. (*See* R.R. III at 3103a.) However, in reaching its conclusion, the Commission simply considered the proposal before it, which is not an abuse of discretion.[9]

### 3. Track Radius and Banking

Valley View also argues that the record lacks substantial evidence to support the Commission's conclusion that the proposed tight track radius and increased banking is not in the best interests of racing. Valley View asserts that Valley View has not determined the final track radius and grade and that Valley View can accommodate any reasonable radius and grade the Commission might require. However, again, the Commission simply considered the proposal before it. The Commission did not abuse its discretion by failing to consider a track radius and grade that Valley View had not yet determined.

### 4. Backside Paddock

■■■ Valley View argues that the record lacks substantial evidence to support the Commission's conclusion that the proposed backside paddock is not in the best interests of racing. We disagree.

Bedford proposed an indoor paddock next to the grandstand in order to bring the horses closer to the patrons. (R.R. II at 1245a.) Bedford's witnesses testified that: (1) currently, harness tracks do not have paddocks that are integrated into

grandstands; (2) to promote racing, harness tracks need to bring horses closer to the patrons; and (3) a harness track that has a paddock next to the grandstand can achieve that purpose. (R.R. II at 1257a, 1263a, 1294a, 1452a, 1456a–57a.) The Commission accepted this testimony, which constitutes substantial evidence to support the Commission's conclusion that a backside paddock would not be in the best interests of racing.

### 5. Separate Backside Entrance

Valley View argues that the record does not contain substantial evidence to support the Commission's conclusion that the topography, which prevents having a separate backside entrance, is not in the best interests of racing. Valley View contends that it presented evidence to show that it could adjust the backside of the track to accommodate any reasonable requirement for a backside entrance. However, the Commission simply considered the proposal before it. The Commission's failure to speculate regarding the adjustments that Valley View might make to the backside is not an abuse of discretion.

## II. Bedford—No. 2441 C.D. 2005

### A. The Deceased Grandfather

■■■ Bedford argues that the Commission abused its discretion in denying Bedford's application on grounds that the deceased grandfather of Bedford's principals did business with reputed organized crime figures through family-owned companies that still exist. We agree.

The Commission may refuse to grant a license if the experience, character or fitness of any *officer, director or stockholder* is such that his or her participation in

---

**9.** We note that, if the Commission had allowed applicants to revise their proposals to reflect the best features of the other facilities,

there would not have been a true comparison of proposals.

horse racing or related activities would be inconsistent with the public interest or with the best interests of racing.[10] 4 P.S. § 325.209(e). The deceased grandfather is not an officer, director or stockholder of Bedford. Thus, there is no statutory basis for considering whether his previous business dealings with reputed organized crime figures are consistent or inconsistent with the best interests of racing.

Notably, under section 209(e) of the Reform Act, the Commission may disregard a stockholder's conviction of a crime involving moral turpitude, illegal gambling, fraud in connection with racing, and more, if the stockholder's interest is insufficient to adversely affect the corporation's lawful conduct of pari-mutuel horse racing. 4 P.S. § 209(e). If the statute allows the Commission to disregard such actions as long as the stockholder cannot adversely influence the lawful conduct of pari-mutuel horse racing, it is manifestly unreasonable to deny a license based on the past actions of a deceased person who, obviously, can have no effect on a corporation's conduct of pari-mutuel horse racing.[11]

### B. The Ground

Bedford argues that the Commission abused its discretion in denying its application because the Commission believed the deceased grandfather acquired most of the land upon which Bedford plans to build its facility while his companies were attempting to earn money by dealing with reputed organized crime figures. We agree.

The Commission concluded that the appearance of a connection between organized crime and the ground upon which Bedford intends to construct the facility is inconsistent with the best interests of racing. (Conclusions of Law, No. 16.) However, as indicated above, the law is concerned with the possible adverse influence that *people* might have upon the lawful conduct of pari-mutuel horse racing. It is absurd to believe that the *ground* upon which the racing facility is built will induce Bedford to violate the racing laws.

### C. Financing

■■■ Bedford argues that, although the Commission found that Bedford "presented what appears to be adequate financing" for the project,[12] (Adjud. at 71), the Commission improperly raised concerns about Bedford's ability to finance the project. We agree.

### 1. Identity of Borrower

The Commission expressed concern that the Merrill Lynch "highly confident" letter indicated that "the identity of the Borrower ... is presently undetermined." (R.R. I at 811a.) However, the letter specifies that the term "Borrower" refers to Bedford or an operating subsidiary or affiliate

---

10. The Commission concluded that the experience, character and fitness of each officer, director and shareholder of Bedford is such that his or her participation would be *consistent* with the public interest and with the best interests of racing. (Conclusions of Law, No. 15.)

11. To the extent that the Commission relied on Act 71 in considering the deceased grandfather's business dealings, the Commission erred. The Commission has no authority to act under Act 71. Bedford applied to the Commission for a license to conduct harness horse racing with pari-mutuel wagering, not a license to offer slot machine gaming at its proposed facility. The licenses, the statutes and the governing agencies are separate and distinct.

12. The Commission determined that Bedford appears to have adequate financing based on a letter issued to Bedford by Merrill Lynch, which states that Merrill Lynch is "highly confident" of its ability to underwrite the debt financing for Bedford's project. (R.R. I at 811a.)

of Bedford. (R.R. I at 810a.) The individual who drafted the letter explained that: (1) the structure of a deal varies by project; (2) sometimes a company will create subsidiary corporations in order to split the casino operations from the horse track operations; and (3) "[w]e just wanted to have a letter which would encapsulate each one of those different options." (R.R. II at 2281a.) In other words, the failure of the letter to identify the precise "Borrower" has no effect on Bedford's ability to obtain financing.

## 2. Conditions

The Commission also expressed concern that Bedford's financing letter from Merrill Lynch contained more conditions than Valley View's financing letter. However, the Commission did not make any findings of fact with respect to the conditions that Merrill Lynch imposed on Bedford in the letter. Thus, there is no finding that Bedford will be unable to meet any of the conditions. Absent some finding, based on substantial evidence in the record, that Bedford cannot meet the conditions imposed by Merrill Lynch, there can be no reason for concern about Bedford's ability to finance the project based on those conditions.

## 3. Isle of Capri and CIBC

Finally, the Commission expressed concern that Merrill Lynch based its letter, in substantial part, on the high level of confidence Merrill Lynch had with Isle of Capri and CIBC, not on its own review of the project or the individuals involved in the project. The implication is that: (1) the departure of Isle of Capri and CIBC was due to financing concerns; and (2) if Merrill Lynch had reviewed the project and the individuals involved in the project, it would not have issued its letter. However, the record lacks substantial evidence to support the Commission's finding of concern.

The undisputed evidence is that Isle of Capri and CIBC ended their involvement in the Bedford project because of a disagreement over management philosophy, *not* because they were no longer "highly confident" in their ability to finance the project. Bedford had entered into a memorandum of understanding with Isle of Capri, and Isle of Capri contacted CIBC regarding financing. (R.R. II at 1573a–75a, 1604a–05a.) CIBC issued a "highly confident" letter based on its "experience in the gaming market, its understanding of the Bedford Downs project, and its comfort . . . with Isle of Capri." [13] (R.R. II at 1565a.) However, Isle of Capri, in further negotiations with Bedford, wanted Bedford to adopt the Isle of Capri "brand" for all operations, i.e., allow Isle of Capri to manage all operations. (R.R. II at 2148a–49a.) Isle of Capri ended the negotiations when it became clear that Bedford only would allow Isle of Capri to manage slot machine operations. (R.R. II at 2149a, 2152a.)

When the negotiations with Isle of Capri failed, Bedford pursued a previous offer of a "highly confident" letter made by Innovation Capital Holding (Innovation Capital), a gaming transaction consulting business with ties to Merrill Lynch. (R.R. II at 2092a, 2099a, 2102a–04a, 2120a–21a.) Innovation Capital then contacted Merrill Lynch regarding financing. (R.R. II at 2120a–21a, 2227a–28a.) The Vice President of the Gaming and Leisure Group of Merrill Lynch testified as follows:

---

**13.** The Managing Director of CIBC testified, "When we say we're highly confident, we fully intend to get this deal done or we wouldn't be in this business for a long time if we issued highly confident letter[s] and then [were] not . . . successful in raising financing." (R.R. II at 1561a, 1593a.)

We met with [Innovation Capital]. We had on the phone the lawyers, we had ... all three of the shareholders of [Bedford], the three siblings.... We discussed the project. We had received some information from Innovation Capital.... We had also received their projections.... We took a look at the sources and uses, and we talked about the project. We talked about the situation with Isle of Capri. We gained a lot of confidence that Isle of Capri ... had been willing to do this deal, had structured a deal already, and that CIBC had previously issued a highly confident letter for this project. That gave us a lot of comfort.

We also knew Innovation Capital. And Innovation Capital was a reputable firm. And I've worked with [them] before. And so [they were] bringing a deal to me. It was evident that [they were] presenting me a project that [they] knew would be appropriate for our firm.

Having said that, we wanted to question them about the budget. We wanted to question them about the project. We wanted to question them about the market. We received the Innovation Group market study. We reviewed that. And that substantiated the financials. We had talked with management.

We also wanted to make sure that the ... family, whom we did not know as a firm, was appropriate to be doing business with. So we asked for background checks.... I did speak with the investigators and found nothing that would give me pause to do business with them.

(R.R. II at 2212a, 2227a–29a.) Questioned further about the background checks, the Merrill Lynch witness testified:

I called the individual up and asked them specifically what had he done and what types of things he had looked into and what type of background checks he had done, because there are different levels of background checks. And he had done, based on my six years of experience in the gaming sector, the same type of background checks as a full background check that I would have done.

(R.R. II at 2292a.) Clearly, then, Merrill Lynch did not simply rely on the previous involvement of Isle of Capri and CIBC. Merrill Lynch reviewed the project and the individuals involved in the project before issuing its "highly confident" letter. Therefore, we conclude that the Commission abused its discretion in questioning, without any valid reason, the "highly confident" letter issued by Merrill Lynch.

Accordingly, we vacate the Commission's November 3, 2005, order to the extent that it denied Bedford's application, and we remand this case to the Commission for reconsideration of Bedford's application in light of the foregoing discussion. We affirm the Commission's November 3, 2005, order to the extent that it denied Valley View's application.

### ORDER

AND NOW, this 19th day of June, 2006, the order of the State Harness Racing Commission, dated November 3, 2005, is hereby affirmed to the extent that it denied the license application of Valley View Downs, LP. To the extent that the November 3, 2005, order denied the license application of Bedford Downs Management Corporation (Bedford), the order is vacated, and this case is remanded for reconsideration of Bedford's application in accordance with the foregoing opinion.

Jurisdiction relinquished.

DISSENTING OPINION BY President Judge COLINS.

I respectfully dissent from the decision as to Valley View Downs and would vacate and remand, both applications. I agree with Valley View Downs that the Harness Racing Commission's decision with respect to its license application was impermissibly based on track and facilities standards not known to the applicant. The Commission's denial of the Valley View's license is inconsistent with its acceptance and approval of the same size track at the Chester Downs, and its characterization of Valley View's 5/8–mile track as inconsistent with the best interests of racing and as unsafe for horses creates an impression of arbitrary and capricious decision making based on pretextual findings. The Commission's handling of both applications creates an appearance of impropriety.

At the time Valley View Downs filed its application, two licenses were available with five applicants, including Chester Downs, but not including Bedford Downs. The Commission ruled on the Chester Downs application seven months after it was filed without comparison to the other pending applicants, then issued a policy statement changing the review process with the effect of subjecting Valley View's pending application to competition and comparison with other applicants, including Bedford Downs, which had yet to file an application, for the one remaining license. Given the influence of the potential gaming license that would inure to the successful licensee, the Commission's denial of Valley View's license appears to be based less on the criteria set forth in the Reform Act and more on its own subjective evaluation of which applicant(s) will best serve the public interest, convenience,

and necessity, an arguably vague standard that leads to the kind of arbitrary decision making that occurred with respect to Valley View's license application.

Further, by remanding one matter and not the other this Court is creating the impression that it is, *de facto,* awarding the fifth and final harness racing license. Since the possession of the fifth and final harness racing license is predicate to the award of a casino gaming license the ramification of this Court's actions goes well beyond a mere remand. Licensing decisions such as the instant controversy should be left exclusively to the Boards and Commissions created by the Legislature for the award of such licenses.

I would remand both matters with instructions that the Commission remedy the previous errors that resulted in the denial of due process for both applicants, and that new hearings be held with appropriate procedural and substantive due process.

Judge McGINLEY joins in this dissent.

CONCURRING AND DISSENTING OPINION BY Judge SIMPSON.

I agree with the well-written majority opinion as to the issues involving Valley View's application. However, I respectfully dissent from the decision to vacate and remand for further consideration of Bedford's application. For the reasons that follow, I would affirm the Commission on both applications.

Section 209(a) of the Race Horse Industry Reform Act (Reform Act), 4 P.S. § 325.209(a),[1] provides in pertinent part: "If, in the judgment of the appropriate commission, the public interest, convenience or necessity will be served and a proper case for the issuance of the license is shown, the appropriate commission may

1. Act of December 17, 1981, P.L. 435, *as* *amended.*

issue the license." Several other clauses of this Section of the Reform Act make it clear that the Commission may consider the public's interest not only in relation to the officers, directors or stockholders of any corporate applicant, but also in relation to the corporation itself, Section 209(a), and to any person, firm, association, or corporation other than the applicant that will share in the profits or participate in the management. Section 209(e)(3).

After a commendably extensive evaluation, the Commission concluded in relevant part as follows:

> The mere appearance of connection and involvement of Ambrosia Coal and Construction Co. (and other family-owned companies) with organized crime and the ownership of the ground upon which Bedford intends to construct the project reflects negatively upon the racing industry and is therefore inconsistent with the best interests of racing.

Conclusion of Law, No. 16. The detailed discussion supporting this conclusion takes up several pages of the Commission's decision. Commission Adjudication at 75–82.

I discern no error in the Commission's common sense conclusion. It was well within the Commission's broad discretion to conclude that issuance of a license upon an application which embraces a long, unresolved history of land owner involvement with reputed crime figures does not serve the public interest.