Wotherspoon *v.* Wotherspoon, Appellant.

Argued November 18, 1932.

Before TREXLER, P. J., KELLER, GAWTHROP, CUNNINGHAM, BALDRIGE, STADTFELD and PARKER, JJ.

*William T. Connor,* and with him *John R. K. Scott,* for appellant.

*William A. Gray,* for appellee.

Opinion by Keller, J., March 3, 1933:

This was an action of divorce brought by a husband against his wife, on the ground of adultery. The master recommended that a divorce be granted. The court dismissed exceptions to the report and entered a decree as recommended by the master.

Adultery on the part of the wife is, in our opinion, established by the evidence. The issue on this appeal is whether the act of adultery proved in the case was procured or brought about by an agent or agents of the husband; whether he or they were active in promoting and procuring the act of adultery which is relied on to secure the divorce.

It has been the rule of the English courts, followed by the appellate courts of this State, that if a wife is led into adultery by the acts or procurement of the husband's agent, even though the husband may not have authorized or directed his agent to bring it about, he is not entitled to a decree. In Gower v. Gower L. R. 2 Prob. & Div. 428, (1869-1872), a man named Williams, who had been employed by the petitioner to obtain evidence against the respondent, planned a four day pleasure excursion to Worcester and three other towns. The party was made up of Williams and a woman of the town who passed as his wife, a man named Golding and a woman who

passed as his wife, and the respondent and Hill, the co-respondent. Williams plied the respondent and Hill with liquor and while thus intoxicated they spent several nights in bed together. The petitioner, Gower, denied that he had ever instigated Williams to induce the respondent to commit adultery or sanctioned his taking any steps with that in view, and the judge ordinary assumed the truth of his denial, but held that the participation of his agent in procuring the act of adultery relied on debarred him from relief, saying: "If a husband employs a man to get evidence of adultery upon which to obtain a divorce, and the man so employed sets about to procure the defilement of the wife, and by the intervention of that man the wife is purposely induced to commit adultery, the petitioner has no right to a remedy in this court for such adultery; and I further think that the husband would have no right to a remedy even if it were proved that he had not given any distinct orders for the purpose ...... I decide the case on the broader ground that the petitioner cannot obtain the benefit of redress in this court for an act of adultery brought about by his own agent."

A similar ruling was made by this court in Clawell v. Clawell, 63 Pa. Superior Ct. 88, where, speaking through President Judge ORLADY, we said: "Text writers and our courts agree, that a man who suspects a wife may take means to procure proof, but he must not lead her into a fresh wrong because he feels she is guilty of an old one. He may leave open the opportunities which he finds, but he must not lay new temptations in her way; it is one thing to permit, and another to invite; and one who takes advantage of an agent's unauthorized fraud is answerable for the fraud; when a husband intentionally lays a lure for his wife, either acting in person or through an agent, his will necessarily concurs in her act."

In Fisher v. Fisher, 74 Pa. Superior Ct. 538, a firm of detectives was employed by the husband to secure evidence of his wife's adultery. They employed a man named Devine, who was found by three other of their employees in the company of the wife in such circumstances as justified a finding that they had committed adultery. It was not proved or contended that the husband knew that Devine had been or would be employed by the detectives to bring about the wife's adultery; but we said: "It matters not that the husband himself may have given no orders for such conduct on the part of his detective; he cannot obtain redress from the courts for an act of adultery brought about by his own agent."

Practically the same circumstances existed in the case of Illg v. Illg, 78 Pa. Superior Ct. 212, and following the above cases we held that the husband could not obtain a decree of divorce where the act of adultery relied on was brought about by his agent, even though he may have had no prior knowledge of or given no orders for the misconduct of his agent.

The general principle was approved by this court as late as 1926 in the case of Nacrelli v. Nacrelli, 87 Pa. Superior Ct. 162, which was affirmed by the Supreme Court in 288 Pa. 1; and is upheld in other jurisdictions in this country. See Dennis v. Dennis, 68 Conn. 186, 36 Atl. 34, where the libellant, the wife, did not give her attorney, or any of the detectives employed by him, any authority or direction to employ the lewd woman who was found with the husband in circumstances indicating that he had committed adultery with her; but she had been so employed; and the fact that her agent, even without her knowledge had been instrumental in bringing about the act of adultery relied on as ground for divorce prevented her obtaining a decree. In Rademacher v. Rademacher, 74 N. J. Eq. 570, 70 Atl. 687, a husband employed persons to pro-

cure evidence of his wife's adultery on which to obtain a divorce, and such persons set about to procure the defilement of the wife and by their active intervention the wife was induced to commit adultery; it was held that the husband could not have a divorce, although it was proved that he had not given any distinct orders to such persons so to act. The active agent in that case was a woman employee of the detective agency who invited the wife to go to New York where they met two men one of whom was subsequently found in bed with the wife. To same effect, see McAllister v. McAllister, 137 N. Y. Supp. 833.

The principle being established our present duty is to see if it is applicable to the facts in this case.

The libellant in this case consulted an attorney, who employed the same detective agency whose operatives, in company with that attorney, had surprised the libellant's second wife—the present appellant is his third wife—in a bedroom at a hotel in Philadelphia, where they had registered as man and wife, resulting in his divorce, about a year before. The detectives worked under the direction of the attorney, to whom they reported, he in turn reporting to the libellant. The libellant had also employed for several years a colored man named Williams, who acted as cook, butler and house-man in his household. The questions which arise out of these employments are: (1) For what purpose was the detective agency employed? (2) Was Williams an agent, acting for the libellant or his detectives, in the surveillance of his wife? (3) Were these agents or any of them instrumental in bringing about the wife's adultery?

(1) The ostensible purpose of the employment of detectives was to find out where the wife was getting liquor; it having been testified that shortly before November 23, 1930 she had returned to her home about twelve o'clock midnight under the influence of liquor.

A careful reading of the testimony satisfies us that this was merely a blind; that the real purpose of their employment was to obtain evidence of the wife's adultery; that the ostensible reason was adopted as a subterfuge to escape the effect of the decisions above cited. The husband had a right to employ detectives to discover if his wife was unfaithful to him; but it followed as a consequence that if their enthusiasm outran their discretion and they assisted in bringing about her defilement, he would be visited with the results of their improper action, while such a result would less likely follow if their employment had had no relation to her infidelity. Our reasons for holding that the ostensible purpose of their employment was only a subterfuge are: (a) That the husband knew where his wife was getting liquors, viz., that she was being furnished with liquors by his butler and employee, Williams, who had a key to libellant's winecellar and who was buying other liquors from a bootlegger named Herman. Williams had been arrested by a policeman named Schuckert,—who is alleged to be the corespondent—and a fellow police officer, a few days before the employment of the detectives, while he was bringing home liquor from the bootlegger. The libellant, was fully acquainted with all these facts, see Record 53a, 57a, 111a, 113a, 118a, 616a and 632a. There was no reason to employ detectives to find out what he already knew; and the first step in an honest attempt to rid his wife of her propensity for liquor would have been to discharge Williams. (b) The detectives knew within one day after they were employed where the wife got liquor and that Williams was serving her with drinks. The reports made by the detectives to the attorney would have been helpful in determining the real purpose of their employment, but although called for, the libellant and his attorney would not produce them and the master did not re-

quire their production. On the questions of fact raised in this issue we think they were relevant and material; but apart from them the evidence is convincing to us that the detectives were employed by libellant for the purpose of obtaining evidence of his wife's unfaithfulness, and the alleged employment relative to furnishing her liquors was a mere blind. It admits of no other reasonable conclusion.

· (2) We are also convinced from the evidence that Williams was an agent of the libellant and the detectives in the surveillance of the wife. We have carefully reviewed the nearly a thousand pages of testimony in the case and within the reasonable limits of an opinion can give only a few of the circumstances which lead us to this conclusion. In the first place libellant admitted telling Williams that he had employed Stauffer (the head of the detective force) to "shadow" his wife. Libellant and his wife had gone on a trip to New York from which he went to Chicago ostensibly on business, while his wife was to return home a day or so later. He left word with Williams to notify Stauffer just as soon as his wife returned; and this Williams did, not only by telephoning but by visiting and telling Stauffer where he or his operative could find the automobile—[giving the license number]—in which he had brought the respondent to a theatre, and where she could be seen in it. The detectives who were shadowing the house saw Williams serve drinks to the respondent and to Schuckert and the other officer, and drink with them; saw Williams go after Schuckert in libellant's automobile and bring him to the libellant's house, at least twice; once the day before, and again on the same day, the adultery was committed. They saw Schuckert drive out with respondent, get a bottle of liquor and stop in front of a rooming house on Arch Street, into which he invited her to go and she would not. While libellant was

away Williams telegraphed to him about men being in the house during his absence, which was corroborated by his attorney by telephone, who told him of their being upstairs in his house and being served with liquor by Williams. Williams received no rebuke from his employer because of this message, nor a discharge, which would have been the natural act of a husband if the report had been officiously volunteered and had not been expected or arranged for. Later in the week he again telegraphed libellant: "Be in town by Saturday night [the night of the adultery] but don't come home. Get in touch with your men." When due to some disturbance with the maid, and because of his drinking, Mrs. Wotherspoon had Williams arrested and taken to the local jail or lock-up, he telephoned to Stauffer, who came at once and had him released by paying his fine and costs, and charged the money so paid as part of his expenses on the case, and collected it from libellant. He introduced Stauffer to the respondent, while still in her bed in the morning, as a Mr. Barratt, who had assisted him in getting out of jail. On the night the adultery took place, after Williams had brought Schuckert to the libellant's house in the latter's automobile, four detectives were in the house and had been there most of the day, while Williams was plying the respondent and her guests with drink, concealing the detectives and feeding them in the cellar, until the condition of the parties spied upon permitted them to hide behind a screen in the dining room. When things were getting to the pass that adultery was imminent or at least probable, Williams, taking the maid with him, so that the respondent would apparently be alone with Schuckert and the other officer—, who was then drunk,—went after libellant's attorney, who was visiting in the neighborhood, and brought him to the house where he (the attorney) watched on the outside for over an hour until the re-

spondent and Schuckert went upstairs, when the attorney and Stauffer and three other detectives and Williams and the maid burst in upon them. While Stauffer said Williams went after the attorney of his own motion he admitted having told Williams where the attorney could be found, as he had previously been informed by the attorney, and Stauffer took no other steps to bring him there although arrangements had been made for the attorney to be there. Libellant testified that Stauffer had sent Williams after the attorney. It is true that Stauffer tried to make out that Williams' actions were distasteful to him and that there was no cooperation between them, but his actions speak louder than his words. We are satisfied that Williams was an agent in the surveillance of the respondent acting with the full knowledge of the libellant and the detectives and with the authority of the former. We do not mean to imply that everything he did was authorized by the libellant or the detectives. His enthusiasm in the 'hunt' may have led him to do more than he was expected or authorized to do, but he was part of the surveillance squad and was an agent of the libellant.

(3) We are also satisfied that of the agents of the libellant Williams at least was active in encompassing the unfaithfulness of the respondent and bringing about her adultery, and so far as the detectives cooperated with him they are chargeable with the same result. The evidence which establishes his part in the espionage of the respondent also establishes his active interest and agency in bringing about the adultery of the respondent. It is unnecessary to repeat it, beyond pointing out that Williams started the respondent's acquaintance with Schuckert, the co-respondent, a few days earlier, by introducing him to her in her bedroom while she was still in bed. In addition to introducing Schuckert to respondent we find him fre-

quently plying them with liquor and on at least two occasions going out after Schuckert and bringing him to the house in libellant's automobile; once the day before the adultery and again the day of the adultery —all under the watchful eyes of from three to four detectives, who by his help were concealed on the premises. That the trap was all prepared to be sprung on Saturday we find from his telegram to his employer; by the concealment of the four detectives in the house for practically the whole day, starting from early morning before Williams brought Schuckert to the place and continuing until one o'clock next morning; from the arrangements made to notify libellant's attorney and bring him there that night; and from Williams' boast made, while apparently feeling the effects of liquor he had drunk, to the bread delivery man, Floyd, who had called on Saturday afternoon to get the usual bread order for Saturday and Sunday that no bread would be needed because "We're getting ready to pocket the old lady. The house is full of detectives." The appellee makes light of this testimony but to us it is of considerable weight. Floyd was a foreman of the General Baking Company, occupying a responsible position, who was temporarily handling the route. He was wholly disinterested, testified under subpoena, unwillingly and only after threat of attachment, and he swore that that same day he had told another bread man in Narberth of his conversation with Williams, saying that he didn't believe it; and that the occasion was impressed on his mind because on the following Monday this man called his attention to an item in the paper giving an account of the raid on respondent's home as Williams had predicted. He said the name of the man, to whom he had repeated what Williams said, was Thomas Norbach. The libellant had ample time and opportunity to hunt up this man and check Floyd's testimony but failed to

call him. If Floyd's testimony was true,—and it was not contradicted by Norbach,—there can be no question of the trap to catch the respondent and of Williams' active cooperation in bringing about the occasion of the respondent's unfaithfulness, and the cooperation of the detectives with him makes them party to his actions.

The libellant contends that what Williams did was only in obedience to the orders of the respondent. The testimony as a whole does not bear out this conclusion. Certainly his bringing Schuckert, the first time, to respondent's bedroom in the morning before she was up, and his like introduction of Stauffer to the respondent in her bedroom, while she was still in bed, were his own ideas, not ordered or suggested by respondent. Had he been half as concerned in protecting the honor of his employer's household as he seems to have been in accomplishing its dishonor he could have refrained from these activities without fear of losing his position.

On full and careful consideration of all the evidence we are of opinion that the agents and employees of libellant, or some of them, employed by him to watch, or spy upon, his wife for the purpose of obtaining evidence of her adultery, were active in promoting or procuring the adultery of his wife and that, in consequence, he cannot obtain redress in the courts for an act of adultery which his own agent helped to bring about.

The assignment of error is sustained. The decree of the court below is reversed and the libel is dismissed at the costs of the appellee.