# Commonwealth ex rel. McQuiddy, Appellant, *v.* McQuiddy.

Submitted June 12, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Neil Hurowitz,* and *Hurowitz & Plotnick,* for appellant.

*R. Kirkland McQuiddy, in propria persona,* and *George M. Bush,* and *Hartzel, Bush & O'Neill,* for appellee.

OPINION BY PRICE, J., February 2, 1976:

This is an appeal from an order of the lower court entered December 5, 1974 which reduced a prior consent order for the support of two minor children, ages 7 and 2. We find no abuse of discretion in this modification and reduction and will, therefore, affirm.

The parties, who were divorced in February of 1974, entered into a separation agreement dated October 11, 1973 wherein it was agreed that the amount of $90 weekly would be paid by appellee for the support of the two children and wife. Pursuant to this agreement, the amount was to have been increased to $100 weekly on September 1, 1974. A consent order in these amounts was signed by the parties pursuant to this agreement, to be entered should appellee fall into arrears for more than fourteen days. The consent order was entered in July, 1974.

The first August, 1974 payment by appellee was unilaterally reduced to $50; however, on August 5, 1974 appellee filed the petition presently before us on appeal seeking modification of the consent support order. The Bucks County rules require a preliminary conference with a domestic relations officer prior to hearing and such a conference was held on September 20, 1974, at which the parties developed a preliminary record of income, expenses, assets and other matters helpful to the lower court in subsequent hearings. The lower court conducted hearings on November 22, 1974 and December 5, 1974 and at the conclusion of such hearings entered the order now on appeal reducing the support order to $50 per week.

At the time appellee entered into the agreement and consent order he was a salaried employee of a local cor-

poration engaged in the construction industry and was earning a gross weekly salary of $200 and a net of $165 per week. In addition the lower court found that at that time he had a $50 weekly income from other sources which translated to a total of $215 net income per week. In December of 1973 the appellee, an attorney properly qualified in this Commonwealth, elected to leave the shelter of salaried employment and entered the private practice of law which has since then become his sole source of income. At the time of the hearings in the lower court it was found that after almost a year in the private practice he had current net earnings of approximately $100 per week, or less than half of that which had been available at the time he entered into the consent order of $90 per week.

The appellate review of support orders is very narrowly defined and upon appellate review we will not, and indeed should not, interfere with the lower court's determination absent a very clear abuse of discretion. *Commonwealth ex rel. Sosiak v. Sosiak*, 177 Pa. Superior Ct. 116, 111 A.2d 157 (1955).

It is not for us to decide whether we would have made a similar order, or in fact, any order at all, but merely to determine whether the trial court is chargeable with an abuse of discretion. *Commonwealth ex rel. Groff v. Groff*, 173 Pa. Superior Ct. 535, 98 A.2d 449 (1953). As our court stated in *Irwin Borough Annexation Case (No. 1)*, 165 Pa. Superior Ct. 119, 133, 67 A.2d 757, 764 (1949) :

> " 'An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record, discretion is abused.' *Mielcuszny v. Rosol*, 317 Pa. 91, 93, 176 A. 236. 'When the court has come to a conclusion by the exercise of its discretion, the party complaining of it on appeal has a heavy burden;

it is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power': *In re Garrett's Est.,* 335 Pa. 287, 292, 6 A.2d 858.''

Judge BODLEY, of the Court of Common Pleas of Bucks County, reviewed the testimony in his opinion and said of it, in part:

"The foregoing is a portrait of a tragic and all too common consequence of the separation of young married people who have children. Each, in the opinion of the Hearing Judge was credible. The alleged expenses of each are modest indeed. There is little doubt that the Relatrix requires more income to sustain herself and her children under her present circumstances than she now receives from her employment and the contribution of the Respondent. But the parties have been divorced and the sole question before the Court is whether or not there has been a change of circumstances affecting the interest of the parties between the time of the agreed $90.00 per week order and the time of hearing. A material change in such circumstances appears clear in this case. *Commonwealth ex rel. Naselsky v. Naselsky,* 199 Pa. Superior Ct. 270 (1962). Not only have the parties been divorced, thus automatically reducing the agreed order by the sum of $30.00, but the Respondent is earning substantially less income than he was at the time of the original agreement. It is true that we must look beyond actual earnings and consider earning power and the nature and extent of the Respondent's property and other financial resources. *Shuster v. Shuster,* 226 Pa. Superior Ct. 542, 547 (1974). The Hearing Judge has done that and in the exercise of his discretion reduced the order to the sum of $50.00.

"While counsel for the Relatrix, in terms often less than complimentary, challenged the truthfulness of the Respondent's testimony, the Hearing Judge does not share his views and chooses to accept the testimony of a member of this Bar at face value. He would be chagrined were there to be later offered proof of deception. There has been no such proof offered, and it is hoped that the Respondent's decision to abandon the security of the payroll for the vagaries of the private practice of law will be in the future a rewarding one, though the source of some deprivation for the time being. It is to be hoped that the latent 'earning power' to be found in every young lawyer will emerge with the passage of time and will enure to the benefit of Respondent's minor children as well as to himself. That earning power should not be equated to the higher earnings which he might for the time being command as a salaried employee at the expense of abandonment of his professional career. We do not think that it is such a concept of earning power which we are to look for when we look beyond actual earnings in our search for ability to pay. The Order entered was intended to be just as to both parties and to their children and it is hoped that such will prove to be the case."

In a support proceeding, the trial judge who sees and hears the witnesses is in a better position than the Pennsylvania Superior Court to decide the issue on its merits. *Commonwealth ex rel. McNulty v. McNulty*, 226 Pa. Superior Ct. 247, 311 A.2d 701 (1973).

Applying the applicable principles to the matter herein under review we do not find any abuse of discretion on the part of the lower court.

The order entered by the lower court on December 5, 1974 is affirmed.

396

DISSENTING OPINION BY SPAETH, J.:

The relatrix, Katherine S. McQuiddy, appeals from an order entered by a judge of the Court of Common Pleas of Bucks County reducing a pre-existing support order from $100 to $50 per week. Although I recognize fully the very narrowly circumscribed appellate review of support orders, I cannot agree that the reduction should stand.

I

It is axiomatic that in nonsupport proceedings we will not interfere with the lower court's determination absent a clear abuse of discretion. *Commonwealth ex rel. Voltz v. Voltz*, 168 Pa. Superior Ct. 51, 53, 76 A.2d 464, 465 (1950). Indeed, where, as here, the testimony of the defendant concerning his assets and earnings is challenged, as the reviewing court we must give considerable weight to the conclusions of the lower court. *Commonwealth ex rel. Kane v. Kane*, 193 Pa. Superior Ct. 98, 101, 163 A.2d 925, 926 (1960). This deference is appropriate since the judge of the lower court has seen and heard the parties. *Commonwealth v. Wingert*, 173 Pa. Superior Ct. 613, 617, 98 A.2d 203, 205 (1953).

The narrow issue presented by this case, then, is whether the lower court's action constituted a clear abuse of discretion. In making this determination, we must recognize that

"[a]n abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused."

*Man O'War Racing Assn., Inc. v. State Horse Racing Comm.*, 433 Pa. 432, 451 n.10, 250 A.2d 172, 181 n.10 (1969), citing *Mielcuszny v. Rosol*, 317 Pa. 91, 93-94, 176 A. 236, 237 (1934).

## II

The testimony of defendant-appellee in this case was faltering and evasive. Nonetheless, despite vigorous cross-examination of appellee by counsel for appellant, the lower court "chooses to accept the testimony of a member of this [Buck's County] Bar at face value" (Majority opinion at 395). In addition, the lower court strongly disapproved of the attempts by appellant's counsel to question appellee's credibility (*Id.*; N.T. 77, 78, 111-112). In light of this record, I submit that the lower court's conclusion that appellant's testimony was credible, *see* Majority opinion at 393, was "manifestly unreasonable," *Man O'War, supra,* and hence constituted a clear abuse of discretion. Since determinations of credibility are normally within the province of the trier of fact, *Burbage v. Boiler Engineering & Supply Co., Inc.,* 433 Pa. 319, 323, 249 A.2d 563, 566 (1969), it is necessary to explain the basis of my disagreement with the lower court.

Appellant and appellee, parents of two very young children, entered into a separation and property settlement agreement on October 11, 1973. In clause six of that agreement, appellee agreed to pay $90 weekly for the support of his children and wife; this amount was to increase to $100 per week as of September 1, 1974. The parties simultaneously executed a consent support order, to be recorded only if appellee fell fourteen days in arrears in the support payments. The parties were divorced in February, 1974.

The consent support order was entered of record at the end of July, 1974. At the beginning of August, appellee, without judicial approval, reduced his support payments to $50 per week. On August 5, 1974, appellee filed a petition seeking modification of the consent order. Following a preliminary mandatory conference[1] with a

---

1. Bucks Co. R. Crim. P. 5001(c) requires such a conference

domestic relations officer, held September 20, 1974, a hearing was conducted on November 22 and December 5, 1974.

At the hearing, appellee explained that at the time he executed the consent support order, he was a salaried employee of a construction company earning a gross weekly salary of $200; in addition, he reportedly earned $50 per week from other sources. In December, 1973, however, appellee left his position with the construction company to enter the private practice of law in Quakertown as a sole practitioner. The concomitant drop in earnings, according to appellee, made it impossible to maintain the support payments at the agreed level.

In light of this explanation, it was crucial to determine what other assets might be available to appellee for payment of support. I find appellee's testimony on this important issue unsatisfactory. For example, on direct examination, appellee testified that he owned a one-fifth interest, worth roughly $2,800, in the office building in which he practiced law. The property was actually owned by a corporation in which appellee was one of five principals (N.T. 17). It was purchased in February of 1974, less than two months after appellee had entered the private practice of law, and during the period in which appellee was required to make a weekly support payment of $90. (N.T. 17) Appellee's capital contribution was $2,000; $800 of which was paid in cash or its equivalent,[2] while $1,200 was obtained as a loan from the woman who subsequently was to become appellee's second wife. (N.T. 18-19) It is incongruous that appellee should have access

in any proceeding for termination or modification of a support order.

2. Appellee testified that $350 of his capital contribution was financed by legal services that he rendered to the corporation (N.T. 18).

to such sums of money in February, 1974, and plead poverty in August, only six months later.[3]

More important, it clearly appeared on cross-examination that appellee had not disclosed his interest in the office building at the preliminary mandatory conference held on September 20, 1974.[4] Appellee's explanation of the omission is quite unconvincing when it is considered that appellee is an attorney:

"Q. And you owned one-fifth of a sixty-nine thousand dollar piece of property?

A. Well, the corporation owns the land.

Q. You don't consider you own the land?

A. No. I'm a prospective stockholder. That's what I had—I had stock.

Q. I see.

A. You didn't ask me about stock.

Q. But, did you tell us about the stock at that time?

A. You didn't ask me.

Q. I asked you about assets. Do you remember that?

A. No. You asked me about real estate." (N.T. 28).

This semantic finesse also characterized appellee's testimony concerning his real estate interests in Columbia, South Carolina:

---

3. During the early part of 1974, appellee also wrote a check for $6500, applied towards the purchase of an apartment building in Columbia, South Carolina. (N.T. 54) Had appellee refrained in early 1974 from making these investments in real estate, he might not have had to testify, at the November 22 hearing, that "I would have liked to pay more [than $50 per week support]. I would love to be able to afford to pay more, but I don't make that much money." (N.T. 22)

4. The financial statements that the parties filled out and submitted to the domestic relations officer prominently indicated that the statement "will be presented to the court should a hearing

"Q. What about a piece of property in Columbia, South Carolina? Do you own property there?

A. I don't.

Q. You absolutely do not?

A. I absolutely do not.

Q. Do you hold a mortgage for a piece of property in Columbia, South Carolina?

A. I do not.

. . .

THE COURT: Do you have some financial interest there we might learn about, Mr. McQuiddy?

THE WITNESS: I don't have any financial interest in Columbia, South Carolina.

By Mr. Hurowitz [appellant's counsel]:

Q. Do you have any financial interest in any place in South Carolina?

A. Well, any place there?

THE COURT: The answer has been given, Mr. Hurowitz." (N.T. 34-35).

It is regrettable that the court curtailed the cross-examination at this point, since further questioning would have accented the evasiveness of appellee's testimony.

At the second day of the hearing, on December 5, 1974, it became evident that appellee had not disclosed the ownership of the South Carolina property at the preliminary mandatory conference:

"Q. [by appellant's counsel]: Why didn't you tell Mr. Anderson [domestic relations officer], myself or your attorney at the preliminary conference that you were the owner of property in South Carolina?

A. (Pause)

. . .

Q. Why didn't you tell us in September you were the property owner?

---

become necessary. You are required to complete this form to the best of your ability." *See, e.g.,* Record at 113b (Exhibit D-2).

A. The property was under agreement of sale, and had been for several months.

Q. Mr. McQuiddy, you didn't think you were the owner as of that time?

A. I was not the equitable owner of the property. It was under agreement of sale.

Q. When you told Mr. Anderson what your list of assets were, you didn't think you had any interest in any other property other than what you told Mr. Anderson at that hearing in September?

. . .

A. THE WITNESS: I had the legal ownership —I knew that—but I knew it was under agreement of sale to be sold in October.

Q. And in your opinion, sir, when you listed your assets as one piece of property with a market value of twelve thousand dollars, you did not consider you had any worth in this South Carolina property as of the preliminary hearing?

A. I know I didn't have any worth in it.

. . .

THE COURT: Let us lay the cards on the table. You did own a property that you did not disclose to the support officer because you felt that you did not at that time have an equitable interest in it?

THE WITNESS: (Pause)

THE COURT: The question obviously is: Did you have an asset at the time which you did not disclose?

THE WITNESS: Well, then, under that circumstance, yes, I had an asset." (N.T. 46-49).

Therefore, although subsequent testimony suggested that appellee had lost money on the sale of the South Carolina property (N.T. 68-69),[5] his admitted failure to disclose

---

5. Appellee offered no written records to support his testimony that he had lost money on this transaction. Asked why he did

his ownership interest at the preliminary conference seriously impugned his credibility.[6]

Appellee's testimony was further suspect in light of his initial evasion of service of a subpoena duces tecum and his subsequent failure to produce the documents called for by it. A deputy constable testified that he telephoned appellee on November 18, 1974, and read the contents of the subpoena to him. Although the constable arranged to meet appellee in his law office on November 20, appellee never appeared on that date to accept service, and failed to respond to the constable's written note asking appellee to contact him. (N.T. 95-96)

The subpoena was ultimately served outside the courtroom on November 22, immediately prior to the first day of the hearing on the petition to modify. The testimony indicated that appellee accepted service reluctantly. (N.T. 96)

.Although he had personally received the subpoena appellee brought no documents to the continued hearing on December 5. His explanation for his failure to do so was unconvincing, again especially when it is considered that appellee is an attorney:

"THE COURT: Were you served with a subpoena on November 22nd asking you to bring your records of real estate transactions?

THE WITNESS: Outside of your courtroom, yes, Your Honor, I was.

THE COURT: And you do not have the papers with you?

THE WITNESS: The subpoena was for the 22nd of November. That's when I was supposed to bring them.

---

not adduce written proof to substantiate his contentions, appellee replied that "I don't need records. I have it in my head." (N.T. 68)

6. This was, at least potentially, a substantial asset, important in determining the amount of support appellee should pay. *See* note 3, *supra*, and accompanying text.

MR. HUROWITZ: This is a continuing hearing.

THE COURT: Did you have them at that time, Mr. McQuiddy?

THE WITNESS: No. I was served in the courthouse. I was served when I got here.

THE COURT: Why don't you have them today?

THE WITNESS: Because I wasn't served with a subpoena to bring them here today.

. . .

THE COURT: ... He has told me now that he was not subpoenaed to bring them with him today. But, I share with you in the belief he should have, if that subpoena was validly served." (N.T. 52-53)

The records that appellee failed to produce may have provided written confirmation of appellee's testimony concerning the extent of his assets. Appellee's failure to comply with the subpoena, and his explanation for his non-compliance, suggest he had something to hide.

### III

The lower court found that appellee left his salaried position with the construction company in a good faith attempt to further his professional career. Thus, this is not a case like *Commonwealth ex rel. Haley v. Haley,* 199 Pa. Superior Ct. 235, 237, 184 A.2d 155, 157 (1962), where the husband left a higher paying position without adequate justification.

I can understand appellee's desire to enter the individual practice of law. His professional aspirations,[7] however, must be balanced against the needs of his two young

---

7. It is noteworthy that appellee's status as a lawyer was due in no small part to appellant, who worked as a bank teller during the years in which appellee was a law student. (N.T. 107) In her efforts to support her children adequately since her separation, she has worked in a Burger King restaurant, and at a cocktail lounge in Doylestown, Pennsylvania.

children. I consider that the balance must be struck in favor of the children.

For the foregoing reasons, I conclude that the trial judge abused his discretion in reducing appellee's support obligation. Therefore, I would vacate the order below and remand with instructions to conduct a further hearing consistent with this opinion.

HOFFMAN, J., joins in this opinion.