396 A.2d 765

**COMMONWEALTH of Pennsylvania ex rel. Velma D'ANDREA**

**v.**

**Pasquale D'ANDREA.**

**Appeal of Velma D'ANDREA.**

Superior Court of Pennsylvania.

Argued Sept. 13, 1978.

Decided Dec. 29, 1978.

Daniel C. Barrish, Abington, for appellant.

James T. Vernile, Philadelphia, for appellee.

Before CERCONE, SPAETH and LIPEZ, JJ.

LIPEZ, Judge:

Pasquale and Velma D'Andrea were married on June 11, 1949. In July of 1974, Mr. D'Andrea moved out of the

marital abode, a five bedroom house in Rydal, Pennsylvania, into an apartment in a building he owned in Philadelphia. He took with him nearly all of his personal effects. Mr. D'Andrea indicated to his wife that he was leaving their house in order to live with one Gertrude Murray, which he did at this residence and at others in New Jersey and Philadelphia. Following his departure, Mr. D'Andrea voluntarily made payments to his wife of $1,000.00 per week. These payments continued for nearly three years, and stopped when Mrs. D'Andrea brought the present action.[1]

Approximately two and one-half years after the separation Mrs. D'Andrea was introduced by mutual acquaintances to Carl Fogh. Mr. Fogh maintained residences at the time in Montreal and in New York. He began spending weekends in Mrs. D'Andrea's company at her house one month after they met, and continued to do so up to the date of the support hearing. The court below found that Mr. Fogh keeps some of his clothing and other personal property at Mrs. D'Andrea's house, and receives mail there.

On January 6, 1976, Mrs. D'Andrea executed a criminal complaint charging her husband with failure to support her and the couple's younger child, who at that time was seventeen years old and still living at home. A hearing on entitlement to support was then held before the court. The court denied the petition as to Mrs. D'Andrea, but conditioned the denial upon Mr. D'Andrea's undertaking to make mortgage payments on his wife's home which he did. Mrs. D'Andrea appealed.

The principal issue before us on this appeal is whether the court below gave proper consideration to all matters which it was bound to consider under the rule laid down by this court in *Hellman v. Hellman*, 246 Pa.Super. 536, 371 A.2d 964 (1977). The other issues are: (1) whether Mrs. D'Andrea's alleged adultery had been proven by clear and convincing evidence; (2) whether, if proven, Mr. D'Andrea had condoned her adultery; and (3) whether certain testimony

---

1. At the hearing, Mr. D'Andrea offered to show that he had continued to set aside $1,000.00 per week in a separate bank account.

by Mr. D'Andrea had been properly admitted at the hearing. We conclude that the court below was correct as to all of these points and therefore affirm.

## I

In *Hellman v. Hellman, supra,* this court held that, where support entitlement is at issue, it is error to exclude evidence of adulterous misconduct of the paying spouse, and that such misconduct on the part of both the paying spouse and the recipient spouse must be considered by the trial court in deciding whether to issue a support order. Of course, proof of the paying spouse's adultery will not alone automatically warrant the entry of a support order. This decision must rest within the discretion of the trial court and depends upon the equities of the case. *See* 246 Pa.Super. 542–543, 371 A.2d at 967.

It is obvious that the court below did not refuse to hear evidence concerning adulterous conduct on the part of Mr. D'Andrea. Indeed, it was stipulated by Mr. D'Andrea's counsel:

Mr. Simone: . . . For the record, we will admit and agree that Mr. D'Andrea has been living with this woman. We're not denying it. . . .

(R. 87a–88a)

The trial court also heard evidence concerning Mr. D'Andrea's expenditures on behalf of his paramour, occasions on which Mrs. D'Andrea had seen her husband with Ms. Murray, and Mrs. D'Andrea's general awareness of her husband's relationship with Ms. Murray. Since the opinion of the court below shows that all of the above evidence was considered by the trial judge in arriving at his decision to deny Mrs. D'Andrea's petition, that decision does not represent a manifest abuse of discretion.

Mrs. D'Andrea's first argument continues with the assertion that the court below should have drawn the inference of Mr. D'Andrea's connivance in inducing his wife to commit adultery from the circumstances of the appearance

in court and testimony of Milton Greenspun, and Mr. D'Andrea's failure to call Mr. Greenspun's paramour, Greta Kane. We first point out that Mrs. Kane was not unavailable and could have been called by Mrs. D'Andrea. Secondly, the court below quite properly held that the burden of adducing evidence rested upon the appellant. If, as she seems to claim, certain evidence was not placed before the court, it was for her to offer such evidence.

 Connivance is the corrupt consent to a spouse's adultery. A husband is said to have connived in his wife's adultery when he prostitutes his wife, introduces her into lewd company, or otherwise lures her into misconduct. *See Murphy v. Murphy*, 204 Pa.Super. 576, 205 A.2d 647 (1964); *Wotherspoon v. Wotherspoon*, 108 Pa.Super. 309, 164 A. 842 (1933), *allocatur refused; Heikes v. Heikes*, 90 Pa.Super. 312 (1926) *allocatur refused.* The effect of a finding that a husband has connived to induce his wife's misconduct is to preclude his using her adultery as a defense to the wife's action for support, and to provide the wife a defense to an action for divorce by the husband on grounds of adultery. *Hellman* suggests that connivance may also be found in a husband's "highlighting his continual suggestion that [his wife] see others with the flaunted reality of his own adultery." 246 Pa.Super. at 545, 371 A.2d at 968.

 On a number of occasions following the couple's separation Mr. D'Andrea told his wife to make a new life for herself, and that he would never return to her. After he had become aware that his wife was dating Mr. Fogh, Mr. D'Andrea told her that he was happy for her. Mrs. D'Andrea argues that the fact that her husband did nothing to discourage her relationship with Mr. Fogh shows Mr. D'Andrea's connivance. "[W]e must be convinced that the husband invited, not merely permitted, his wife's adultery." 246 Pa.Super. at 545, 371 A.2d at 968. Mr. D'Andrea's failure to attempt to dissuade his wife from pursuing her relationship with Mr. Fogh is passive behavior, and is merely permission, not invitation. Mr. D'Andrea's voluntary weekly payments to his wife did not constitute connivance, since

there was no allegation that the money was given for any particular purpose, or that the payments were conditional upon certain behavior on the part of Mrs. D'Andrea. It cannot be said that Mr. D'Andrea "flaunted" his relationship with Ms. Murray. There is no evidence that Mr. D'Andrea's actions in that regard were calculated to embarrass, humiliate or even come to the attention of his wife.

Finally, there is no proof that Mrs. D'Andrea's relationship with Mr. Fogh was brought about by Mr. D'Andrea. Mr. Fogh and Mrs. D'Andrea were introduced to each other by Mrs. Kane and Mr. Greenspun. Mr. Greenspun testified that he and Mrs. Kane had between themselves decided that it would be good for Mrs. D'Andrea to become socially active again. Mr. Greenspun's testimony that he was not acquainted with Mr. D'Andrea and had in fact never met before the day of the hearing was uncontradicted. Mrs. D'Andrea's sister, called as a rebuttal witness by counsel for Mrs. D'Andrea, testified on direct examination that Mr. D'Andrea disliked Mrs. Kane, and that he had objected to Mrs. D'Andrea's friendship with her. The evidence presented was thus clearly insufficient to constitute connivance, and we agree with the court below that there was none.

In *Hellman*, this court stated that all of the circumstances of each case must be considered, since an inequitable result might follow if they were not. We cited with approval the words of Chief Judge Cullen of the New York Court of Appeals:

> [A] single act of adultery [on the part of wife], possibly committed at a time long past, and sincerely repented of, should not enable the husband to cast her off without support, though he may be living a life of continuous and [open] profligacy.

*Hawkins v. Hawkins*, 193 N.Y. 409, 422, 86 N.E. 468, 473 (1908). (Cullen, C. J., dissenting) *quoted* in 371 A.2d at 968.

The court below found, and we shall not disturb its discretion in finding, that the situation described by Judge Cullen does not obtain in the instant case. Rather than a single act of adultery on the part of Mrs. D'Andrea, there

was here involved a large number of overnight visits by Mr. Fogh, during an eight-month period.

## II

 Mrs. D'Andrea's second argument is that her alleged adultery was not proven by clear and convincing evidence. The so-called "inclination and opportunity" rule allows a presumption of adultery where (1) both parties to the alleged adulterous conduct are so disposed or inclined; and (2) opportunity has existed for the satisfaction of such inclination. *Levitz v. Levitz*, 199 Pa.Super. 327, 330–31, 185 A.2d 620, 622 (1962). The requisite inclination on the part of Mrs. D'Andrea and Mr. Fogh and opportunity for the satisfaction thereof were shown through the testimony of Milton Greenspun. He stated that he saw physical signs of affection between them. Although Mrs. D'Andrea testified that Mr. Fogh and Mr. Greenspun had slept in the same room, Mr. Greenspun's testimony was otherwise:

[By Mr. Simone]: Where did [Mr. Fogh] sleep?

A. In Mrs. D'Andrea's room.

Q. Where did Mrs. D'Andrea sleep on those nights?

A. In that room.

Q. Did you ever see them both go into the room together at the end of the night, as they were retiring for the evening?

A. Yes, I did.

Q. Did you ever see them close the door?

A. Yes, I did.

Q. Did you ever see them come out of the room in the morning after the evening?

A. Yes, I did.

(R. 128a–129a)

Our function, in a review of this nature, is to determine whether there is sufficient evidence to sustain the court below or whether the trial court committed an abuse of discretion so manifest as to require reversal. *Comm. ex rel. McQuiddy v. McQuiddy*, 238 Pa.Super. 390, 358 A.2d 102

(1976). Further, "[i]n a support proceeding, the trial judge who sees and hears the witnesses is in a better position than the Pennsylvania Superior Court to decide the issue on its merits." 238 Pa.Super. at 395, 358 A.2d at 105. Since the only evidence contradicting Mr. Greenspun came in the form of testimony by Mrs. D'Andrea, we conclude that the trial judge committed no abuse of discretion in choosing to believe Mr. Greenspun rather than Mrs. D'Andrea.

The presumption is supported by Mr. Greenspun's testimony. Mrs. D'Andrea admitted, on both redirect and cross-examination, that she had been dating Mr. Fogh. Mr. Greenspun, under examination by the court, stated that his discussion with Mr. Fogh of his [Fogh's] relationship with Mrs. D'Andrea was one of the factors that had led him to conclude that they were in love. He also testified that he had seen Mrs. D'Andrea and Mr. Fogh embrace on occasion. Finally, Mr. Greenspun's testimony on direct examination, quoted above, clearly shows opportunity. *See Campbell v. Campbell*, 185 Pa.Super. 474, 137 A.2d 830 (1958); *Com. ex rel. Brobst v. Brobst*, 173 Pa.Super. 171, 173–74, 96 A.2d 194, 195 (1953).

Inclination and opportunity on the part of Mrs. D'Andrea and Mr. Fogh are also shown by evidence of other of their joint activities. Mrs. D'Andrea stated, on redirect and cross-examination, that she was "dating" Mr. Fogh. Mrs. D'Andrea also testified that Mr. Fogh stayed with her at her house almost every weekend, and that they had travelled together to Mr. Fogh's home in New York, and to the Kentucky Derby festivities in Louisville, Kentucky, where they stayed at a motel. Numerous items of Mr. Fogh's clothing were stored in Mrs. D'Andrea's bedroom. He kept his socks in a night table next to Mrs. D'Andrea's bed. She also testified that Mr. Fogh stored furniture and various other personal property in her house. The trial court's finding that Mrs. D'Andrea had committed adultery is thus supported by the clear and convincing evidence detailed above, and we shall not disturb that finding.

### III

Mrs. D'Andrea also argues that, even if she had committed adultery, Mr. D'Andrea had condoned it, and thus he would be unable to assert her adultery as a defense. Mrs. D'Andrea argues that *Talley v. Talley*, 215 Pa. 281, 64 A. 523 (1906), would permit a finding of condonation on the facts of the instant case. We do not agree. It is her contention that *Talley* defines condonation as "the blotting out of the offense imputed, so as to restore the offending party to the same position he or she occupied before the offense was committed." This is not a fair statement of *Talley's* holding. In that case, a wife continued to live with her husband, as his wife, for two years after learning that her husband had committed adultery. The Supreme Court held that that course of conduct was condonation. The statutory defense of condonation has been defined as complete renewal of the marital relationship, or a single act of sexual intercourse, after knowledge or belief that adultery had been committed. A Freedman & M. Freedman, *Law of Marriage and Divorce in Pennsylvania* § 213 (2d ed. 1957). *See Com. ex rel. Young v. Young*, 213 Pa.Super. 515, 247 A.2d 659 (1968).

The D'Andreas have not resumed marital cohabitation, nor has any act of sexual intercourse between them been alleged. We therefore see no reason to disturb the finding of the court below that Mr. D'Andrea had not condoned Mrs. D'Andrea's adulterous conduct.

### IV

At the hearing Mr. D'Andrea had offered in evidence seven photographs depicting various of Mr. Fogh's personal effects in the master bedroom and bathroom of Mrs. D'Andrea's home. Mrs. D'Andrea made statements, on cross-examination, concerning the items shown in the photographs. She also was questioned and gave testimony concerning the location of Mr. Fogh's clothing and toilet articles independently of the photographs. The court below, citing lack of proper authentication as "one of the reasons", ruled the photographs inadmissible, and stated that the testimony

of Mrs. D'Andrea concerning them would be disregarded. The court held that testimony of Mrs. D'Andrea unconnected with the photographs would not be affected by the ruling.

Upon review of the record, we conclude that testimony of Mrs. D'Andrea independently establishing facts also presented by the photographs was unrelated to the photographs, and thus was properly admitted and considered by the trial court in issuing its order.

This case is another illustration of the strait jacket in which a court attempting to do justice in a domestic relations matter finds itself by reason of the failure of our legislature to bring our domestic relations law into the realities of contemporary society. Under the law as we (and the court below) find it, we are forced to affirm the refusal of the trial court to enter a support order in favor of a wife against a husband who left her to live with another woman in July of 1974 and continued to do so through the time of the hearing of this case, some three years later. It was several years after the separation, in December of 1976, that the wife began what the court found to be an adulterous relationship with Mr. Fogh. Though the husband admitted that he had encouraged her to find a new life for herself, and was happy that she was seeing another man, the court properly found that there was no evidence of connivance or condonation and refused support.

In *Hellman*, this court loosed some of the fetters imposed by the case law with the result that the trial court is now required to inquire into a husband's misconduct. This the court below did. But courts cannot change the statutory law, and until the legislature does so, inequitable results will continue.[2]

Order affirmed.

---

2. See Judge Spaeth's eloquent dissenting opinion in *Hellman* and his appeal for legislative relief therein.