444 A.2d 742

**Margaret Lesmeister URBAN, Appellant,**

**v.**

**Edmund J. URBAN.**

Superior Court of Pennsylvania.

Argued Jan. 5, 1982.

Filed April 16, 1982.

Petition for Allowance of Appeal Denied
Sept. 16, 1982.

Roland J. Christy, Spring House, for appellant.

Martin J. King, New Hope, for appellee.

Before SPAETH, CAVANAUGH and MONTEMURO, JJ.

MONTEMURO, Judge:

Appellant takes this appeal from the Order of the lower court entered on June 5, 1981, directing the appellee to pay $595 per month towards the support of his wife (appellant hereinafter) and his two minor children, Gregory and Andrea, allocated $210.00 per month per child and $175 per month for appellant.

Appellant argues that the support order entered by the lower court constituted an abuse of discretion. We agree and for the following reasons we reverse and remand for a rehearing.

In deciding this case, we are guided by the following rules of law which set forth our scope of review and which we reviewed in *Commonwealth ex rel. McQuiddy v. McQuiddy*, 238 Pa.Super. 390, 358 A.2d 102 (1976):

The appellate review of support orders is very narrowly defined and upon appellate review, we will not, and indeed should not, interfere with the lower court's determination absent a very clear abuse of discretion. *Commonwealth ex rel. Sosiak v. Sosiak*, 177 Pa.Super. 116, 111 A.2d 157 (1955).

It is not for us to decide whether we would have made a similar order, or in fact, any order at all, but merely to determine whether the trial court is chargeable with abuse of discretion. *Commonwealth ex rel. Groff v. Groff*, 173 Pa.Super. 535, 98 A.2d 449 (1953). As our court stated in *Irwin Borough Annexation Case (No. 1)*, 165 Pa.Super. 119, 133, 67 A.2d 757, 764 (1949):

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record, discretion is abused. *Mielcuszny v. Rosol*, 317 Pa. 91, 93, 176 A. 236. "When the court has come to a conclusion by the exercise of its discretion, the party complaining of it

on appeal has a heavy burden; it is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to *go further and show an abuse of the discretionary power.*" *In re Garrett's Estate*, 335 Pa. 287, 292, 6 A.2d 858, 860.

Appellant and appellee were married on June 27, 1970. Two children were born of this marriage: Gregory was born March 5, 1975 and Andrea was born November 4, 1978. The parties separated on December 25, 1978 and the children continued to reside with appellant. Shortly after the separation appellee moved from Pennsylvania to San Jose, California and in January, 1979 the appellant filed a petition for support in Bucks County, Pennsylvania, under the Revised Uniform Reciprocal Enforcement of Support Act, 42 Pa.C. S.A. § 6741 et seq.; 1976, July 9, P.L. 586, No. 142, Sec. 2, eff. June 27, 1978. In June or July of 1979, the court in California entered an unallocated order of $600 per month for appellant and the two children.[1]

On October 2, 1980, appellant filed the present support petitions in the Court of Common Pleas of Bucks County, Commonwealth of Pennsylvania and therein she requested the sum of $1025 per month for herself and her two children.[2]

1. The record indicates that appellee had a conference with a domestic relations officer in California and that appellee suggested the amount of $600 per month. (N.T. 45, 46) It would appear that the amount of $600 was accepted by the domestic relations hearing officer and entered as an Order of the California Court. The record does not indicate what amount appellant had requested in her reciprocal petition but it is clear that she acquiesced on said order.

2. We note that appellant's petition filed in Bucks County was originally captioned "Petition to Increase Support Order." Sometime later the words "to Increase" were scratched out and the word "for" was substituted. The word "Order" was also scratched out; consequently, the Petition as corrected, read "Petition for Support."

Although the reciprocal Order of $600 per month was still in effect and even though appellant asked that the sum be *increased* to $1025 per month, both parties agreed that any order entered in Bucks County would supercede the order entered in California and that the

The parties appeared for a pre-hearing conference before a domestic relations officer of the Domestic Relations Section in Bucks County Court of Common Pleas in February of 1981 and they each submitted financial data statements. Since the parties could not reach an agreement, the matter was referred for a hearing before a Judge of the Common Pleas Court of Bucks County.

The financial data which was submitted by the parties to the domestic relations officer at the pre-hearing conference does not appear as part of this record; thus, our review, limited as it is, has been made extremely difficult.

We do know that appellant was unemployed at the time of the court hearing and had been unemployed since January of 1975. As already indicated, the parties' first child, Gregory, was born March 5, 1975. Their second child, Andrea, was born November 4, 1978 and so at the time of the court hearing, Gregory was a little over 6 years old and Andrea was a little over 2½ years old.

Appellant testified that she taught in a parochial elementary school from September, 1969 through January, 1975 (N.T. 10). Although appellant did not testify as to her earning as a teacher, appellee testified that she earned approximately $5800 per year.

Appellant's testimony with reference to her expenses indicated that she was paying $380 per month rent for a townhouse owned by her parents.[3] (N.T. 5, 12). After making several adjustments to the list of expenses she had

California order would be vacated (N.T. 49). We will therefore treat this appeal as being taken from an Order in a Petition for Support rather than from an Order in a Petition to Modify an Existing Order.

**3.** The lower court erroneously made a finding that appellant and her two children resided in a *duplex* owned by wife's parents (Emphasis supplied). However, no testimony was presented that appellant had any income at all and the only finding the court made in this regard was that appellant had an *earning capacity* of $5800. Therefore the finding, though in error, was harmless. (Emphasis supplied) Slip Opinion 2, 5.

presented at the pre-hearing conference on February 20, 1981 (N.T. 5), she testified that her total monthly expenses had risen from $1074 to $1124. (N.T. 10).

Appellee is 33 years of age and at the time of the pre-hearing conference, he resided at 4405 Norwalk Drive, San Jose, California. He is employed by Johnson and Johnson Dental Products Company, a division of the Johnson and Johnson Company.

Appellee's testimony with reference to his present income is confusing and uncorroborated by documentation. The only documentary evidence pertaining to his income was his 1979 United States Individual Tax Return Form 1040, which was introduced into evidence by appellant. (Exhibit P–1, N.T. 59a).

That tax return for 1979 showed total earnings from wages of $43,736, less a "moving expense adjustment" of $2,563, and an adjusted gross income of $41,173.[4] However, appellee testified that his actual salary in 1979 was only $26,500; the difference, he said, between $43,736, which he represented as total wages, and his actual salary, constituted relocation expenses *paid by his company* for his move from New Jersey to California. He testified further that the difference of $17,236, *his company's expense,* was money he never saw, but which he nevertheless had to report as income and pay the tax thereon. (N.T. 20) His present move from California back to New Jersey will result in a relocation cost *to his company* of approximately $20,000 to $25,000; again, he says he will never see any of that money but will nevertheless be required to report it as income and pay the tax thereon. (N.T. 22, 23)

4. Appellant attached Form 3903, "Moving Expense Adjustment." to his Form 1040 and he listed thereon *his own* out of pocket money expenses for transportation in moving household goods and personal effects; travel, meals and lodging in moving to his new residence; pre-move travel, meals and lodging in searching for a new residence and temporary living expenses in his new location. On these expenses which appellant claimed totalled $6200., the government allowed him a deduction of $2563. (Exhibit P–1, N.T. 61a)

230

Appellee testified, again without any supporting documentation, that his salary in 1980 was $31,750 and that his new salary beginning in June, 1981, will be $36,000.[5] (N.T. 21)

We find it incredible that appellee would report as income and pay a tax on *his company's* relocation expense of $17,236 in 1979 and $20,000 to $25,000 in 1981 without ever seeing any of the money. His increase in salary for the new position is $4,250—yet he will have to pay U. S. Income Tax on $20,000 to $25,000; cash which he will never see. His employer, we are asked to believe, pays these relocation expenses, over and above those that appellee pays; but to whom and for what? At the very least, the lower court should have requested proof of these employer payments.[6]

■ Even if this were all as appellee says it is, we would still reverse for reasons which follow.

In fixing the amount of the order entered, the lower court found that appellant had an earning capacity of $5,800. Appellant is unemployed, has not worked since 1975, and has two small children at home, ages 6 and 2½ years.

With characteristic wisdom the citizens of the Commonwealth adopted their own version of an Equal Rights Amendment.[7] The Amendment, adopted May 18, 1971, provides as follows:

5. In 1980 appellant received a bonus of $2,000 and shares of company stock worth approximately $750; however, he testified that he's not sure what his bonus will be for 1981, if any. (N.T. 22) The lower court, quite properly, did not include the *possibility* of a bonus in his income. This court has repeatedly stated the rule that surmise and conjecture cannot take the place of evidence. *Haimowitz v. Haimowitz, 221 Pa.Super. 364, 292 A.2d 502 (1972); Commonwealth ex rel. Shumelman v. Shumelman,* 209 Pa.Super. 87, 223 A.2d 897 (1966).

6. We note that the "Moving Expense Adjustment" Form 3903 makes provision at Line 12 for the employee to set forth the reimbursements and allowances received for the relocation with the exception of amounts included in the employees W–2 Form. Here appellee indicated he received no reimbursement and we can only assume that it was included in appelee's W–2 Form which unfortunately is not part of this record; however, the W–2 Form is supposed to reflect income the employee *has received* from his employer. (Exhibit P–1, N.T. 61a)

7. Pa.Const. Art. I, § 28.

"Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual."

Before passing the Equal Rights Amendment, it had long been held that the "primary" duty of support for minor children was firmly fixed with the father. *Commonwealth ex rel. Bortz v. Norris*, 184 Pa.Super. 594, 135 A.2d 771 (1957); *Commonwealth ex rel. Silverman v. Silverman*, 180 Pa.Super. 94, 117 A.2d 801 (1955). This was so even though our courts recognized that the separate earnings of the mother could be considered in setting the amount of the support order against a father. *Commonwealth ex rel. Borrow v. Borrow*, 199 Pa.Super. 592, 185 A.2d 605 (1962); *Commonwealth ex rel. Yeats v. Yeats*, 168 Pa.Super. 550, 79 A.2d 793 (1951).

The "primary duty" of the father concept was laid to rest in the landmark decision of *Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1974). The court said:

"Support, as every other duty encompassed in the role of parenthood, is the equal responsibility of both mother and father. Both must be required to discharge the obligation in accordance with their capacity and ability."

In another landmark case decided by this court, *White v. White*,[8] 226 Pa.Super. 499, 313 A.2d 776 (1973) we held that:

"... a wife's 'earning capacity' may be a material factor on arriving at a reasonable support order."

The unanswered question was whether the court had to consider the mother's *earning capacity* where there were minor children at home.

**8.** Footnote 7 to the Opinion of the *White* court sets out certain relevant factors which the trial court should consider in determining whether an unemployed woman has any earning capacity whatsoever. Such things as: the age and health of the woman; prior work experience and skills; duration of any period of unemployment; and, the existence of minor children in the household; have all been considered as factors which must be taken into account in determining the ability of a woman to seek gainful employment.

In *Commonwealth ex rel. Wasiolek v. Wasiolek*, 251 Pa. Super. 108, 380 A.2d 400 (1977), appellant had a support order for her three minor children in the amount of $45 per week. The parties were separated when the order was entered. Later, following a divorce and when appellee's income increased from $14,000 to $19,255, she filed a petition to increase. When her petition to increase was heard, the children were 10, 8 and 4 years of age. At the conclusion of the hearing, the lower court ordered appellee to pay $75 per week for support of the three children. Appellant took an appeal to this court and the issue presented for consideration was the lower court's view that:

[p]etitioner, in addition to supporting herself, also had a responsibility to contribute toward the support and maintenance of her children. She has worked in the past as a secretary and a nurse, and although she is living with her parents, she presented no evidence of her inability to obtain or seek employment.

When questioned about her unemployed status, appellant in *Wasiolek* responded as follows:

A. I can't find any work with three children, because I have to be there when they go to school and be there when they come home.

Q. Why do you have to be there when they go to school?

A. Someone has to make their breakfast and get them ready for school, and get their books together, and see they are properly dressed and that they make the bus on time.

Q. What time do they go to school?

A. Between 8 and 8:30.

Q. Do you go pick them up?

A. They are within walking distance of the bus, but I have to be in the house when they come home.

Q. Why?

A. Because there wouldn't be anyone to care for them.

The court reversed and remanded holding that:

We believe that the lower court in the instant case abused its discretion when it held, in effect, that appellant had to

secure employment. It is no longer the law that a mother is presumed more fit to care for a child than a father. *Commonwealth ex rel. Spiggs v. Carson, supra* [470 Pa. 290, 368 A.2d 635]; *McGowan v. McGowan*, 248 Pa.Super. 41, 374 A.2d 1306 (1977). Thus, a court must base its custody on sexually-neutral grounds. Once custody of a very young child is awarded, the custodial parent, father or mother, must decide whether the child's welfare is better served by the parent's presence in the home or by the parent's full-time employment. Hence, permitting the nurturing parent to remain at home until a child matures does not run afoul of the E.R.A.—our holding is based on sexually neutral considerations and on the best interests of the child. Of course, a court is not strictly bound by the nurturing parent's assertion that the best interest of the child is served by the parent's presence in the home. It is for the court to determine the child's best interest. But the court must balance several factors before it can expect the nurturing parent to seek employment. Among those factors are the age and maturity of the child; the availability and adequacy of others who might assist the custodian-parent; the adequacy of available financial resources if the custodian-parent does remain in the home. We underscore that, while not dispositive, the custodian-parent's perception that the welfare of the child is served by having a parent at home is to be accorded significant weight in the court's calculation of its support order. *Conway v. Dana* does not require that a court be insensitive to the reality of a non-working parent's contribution to the welfare of a child. Our Supreme Court did not intend to create a *per se* rule that the custodian parent was obliged to work in all cases.

In the case before us the appellee's responses when questioned about her unemployed status were as follows:

Q. When did you decide to return to school as opposed to going back to work?

A. I returned to school in September, 1979–80.

Q. And if you desired to do so, you would as well used that time to earn money; it that correct?

234

A. Not really. I have no way to take care of the children. I can't pay a sitter.

Q. Well the children aren't going with you to school, are they?

A. I'm sorry, I don't understand.

Q. You made arrangements so that you can pursue your educational activities for the children?

A. Right, yes.

Q. You could have made similar arrangements for the children to return to work, could you not?

A. For four hours a week, yes. This is what I was going to school. (N.T. 16–17)

In holding, in effect, that appellant with two minor children aged 6 and 2½ years had to return to work, the lower court committed error.

Finally, at page 5 of its opinion, the lower court said: Husband suggested revisions in his list of monthly expenses which appeared to result in an increase of $200.50, from $2379.09 to $2579.59. These expenses do include husband, his paramour and her two children, for whom husband has no legal liability. However, husband is planning to marry this woman as soon as his divorce is finalized. A divorce decree was entered several days after the hearing. In addition husband owes attorney's fees of $9800 incurred in litigation over custody and the divorce proceeding.

First, there is nothing in the record before us to substantiate that appellee's monthly expenses were $2379.09. The appellee testified only as to changes in his projected monthly expenses as set forth on his financial data statement submitted at the pre-hearing conference and our analysis of his testimony indicates that his monthly expenses would be reduced rather than increased.

Secondly, appellee testified that the list of expenses he submitted included his paramour and her two children. Even though the lower court recognized this and deducted $80 per month for lunches for his paramour's two children, we have no way of knowing what other expense items

included his paramour and her two children or in what amount. We fail to understand the emphasis the lower court places upon the appellant and appellee being divorced several days after the hearing. Indeed, at the very beginning of the hearing in this matter, the lower court was advised that appellant and appellee had entered into a consent to divorce which was filed of record and which was in transit between the Domestic Relations Division and the Judge's chambers. (N.T. 2) If this was true, and it obviously was, we fail to understand why the court awarded appellant $175 per month, an award which would have to be vacated several days after the hearing when the decree was entered. In our view the $175 per month so awarded to appellant should more properly have been considered as additional available income to appellee and in fairness should at least have been so considered in making an award for the two children.

Finally, there is nothing in the record to support the lower court's statement that appellee owed his attorney $9800 in fees incurred over custody and divorce proceedings. But even if this were so, appellant must also have had counsel fees, yet there was no mention of her fees by the lower court. Perhaps appellant was represented by community agency counsel and was not incurring counsel fees; however, we have no way of knowing if this was so.

Appellee's largest monthly expense was $1140 for mortgage payment, which also includes taxes and insurance. He testified that he planned to buy a home in Plainsboro, New Jersey for the price of $95,400, where he would reside with his paramour and her two children. (N.T. 23, 24)

Appellee also offered the following testimony with reference to his proposed purchase of this new home under construction:

Q. Does you new job require either as an explicit written term of your position or as a matter of understanding, any difference in entertaining or other functions which technically are not on-the-job related?

A. Yes, it will. There's an informal portion of my position which requires contact with people whom I'll be

serving in my capacity with Johnson and Johnson, and that will be in the form of entertainment socially at my home. That has an impact on my employability in the future. Again, an unwritten kind of impact, but certainly an impact. Very informal impact, I should say. (N.T. 25)

From this testimony, the lower court found that his employer expected him to undertake certain social obligations requiring him to acquire an appropriate home. The lower court further stated,

"We also took into consideration the high cost of suburban housing in northern New Jersey and the current high mortgage rates." Slip Opinion at 5.

There is nothing in the record to suggest that appellee could not just as well comply with the informal understanding he had with his employer in a home which would keep his monthly expenses within the limit of his available monthly income. In any event his need to entertain at home must be balanced against the needs of his two minor children who live with appellee in a townhouse where the monthly rent is $380 per month.

For all of the foregoing reasons, we vacate the order of the lower court and remand for further proceedings consistent with this opinion.

CAVANAUGH, J., concurs in the result.